STATE of Utah, Plaintiff and Appellee,

v.

Wesley Allen TUTTLE, Defendant
and Appellant.

No. 20068.

Supreme Court of Utah.

April 12, 1989.

Rehearing Denied Oct. 24, 1989.

Kenneth R. Brown, Salt Lake City, for defendant and appellant.

R. Paul Van Dam, Sandra L. Sjogren, Salt Lake City, for plaintiff and appellee.

ZIMMERMAN, Justice:

Defendant Wesley Allen Tuttle appeals from his jury conviction of first degree murder, for which he received a life sentence. *See* Utah Code Ann. §§ 76-5-201, -202(1)(q) (Supp.1988). Tuttle makes three claims on appeal. He contends that the trial court erroneously forced him to waive his right to a jury in the penalty phase to avoid being tried by a "death qualified" jury in the guilt phase; that the trial court erred in admitting hypnotically enhanced testimony and in excluding expert testimony that hypnotically enhanced testimony is unreliable; and that section 76-5-202(1)(q) of the Code, which classifies a knowing or intentional killing committed in an "especially heinous, atrocious, cruel, or exceptionally depraved manner" as first degree murder, is unconstitutional. We reject Tuttle's first claim. We agree with his second claim, but find that the error was harmless. With respect to his third claim, although we do not agree that section 76-5-202(1)(q) is facially unconstitutional, when the statute is construed to be constitutional, it cannot apply to the facts of this case. However, we do find that all the elements of second degree murder were necessarily proven. We therefore reverse and remand for entry of a judgment of conviction for second degree murder and the imposition of an appropriate sentence.

Because we find that the elements of second degree murder were proven and because we conclude that the errors which occurred in the admission of hypnotically enhanced testimony and in the exclusion of expert testimony were harmless when viewed in context, the evidence will be set out in some detail.

On the afternoon of September 26, 1983, Sydney Ann Merrick traveled up Parley's

Canyon in her white Datsun on an errand for her employer. Her body was discovered later that day in her car on the off-ramp of the Summit Park exit. She had been stabbed several times.

The State brought Tuttle to trial on charges of first degree murder, for which the death penalty may be imposed, and offered circumstantial evidence of his guilt. Merrick's father and her fiance both testified, by stipulation, that her Datsun was prone to overheating. A mechanic testified that the Datsun appeared to have overheated on September 26th. He also testified that the car showed signs of having been towed recently. The testimony of the medical examiner and of the witnesses who saw Merrick's legs protruding from her Datsun placed the time of death at around 2:30 p.m.

Records of telephone calls that Tuttle, a truck driver, made to his employer from stops along Interstate 15 placed him in the area of the murder at about 2:30 p.m. On the date in question, Tuttle was returning to Evanston, Wyoming, from California, where he had made a delivery. He was driving a black Chevrolet one-ton truck without a bed that was pulling a thirty-foot flatbed trailer. The truck was equipped with a bug screen bearing the word "Apache," the name of Tuttle's employer. This was the only such truck owned by Apache. The truck carried a chain with hooks that could be used for towing.

Several witnesses testified that they had seen a truck similar to Tuttle's in the canyon on the afternoon of the murder. A witness who was acquainted with the Apache Company testified that while traveling through the canyon as a passenger sometime between 2:00 and 3:00 p.m., he saw a dark one-ton truck, with a thirty-foot trailer and a bug screen that said "Apache," towing a light-colored car. A couple who had been driving to Salt Lake City testified that when they reached Parley's Summit between 2:15 and 2:30 p.m., they saw a truck with a trailer towing a white car occupied by a young woman with hair the color of the victim's. The couple's descriptions of the truck diverged slightly,

but they were consistent in their general recollections. The husband testified that he and his wife discussed their observations on the way to Salt Lake because it was odd to see such a big truck towing a small car.

Another man testified that he was driving past Parley's Summit on his way to Midway when he saw a flatbed truck parked in front of a small white economy car. He said that photographs of the truck Tuttle was driving appeared to show the truck he had seen. He testified that he saw a white woman and a white man with a mustache, collar-length hair, and four days' beard growth standing between the car and the truck; the man appeared to be tickling the woman, but then became violent and shoved her backward into the car. This witness's description of the man he saw matched Tuttle's appearance at the time of the murder. Another witness testified that he saw a man trying to kiss a woman near the Parley's Summit off-ramp. The witness recalled seeing a compact foreign car, but did not remember seeing a truck.

The State presented an expert witness who testified that a strand of hair found in the victim's car was compatible with a sample of Tuttle's hair. The medical examiner testified that a knife which was identified as either one owned by Tuttle or as similar to one that he owned, could have inflicted Merrick's wounds. The State presented evidence that Tuttle washed the truck he had been driving immediately upon returning to Evanston. The State also established that after it became apparent that he was a suspect, Tuttle fled from Evanston and changed his appearance by cutting his hair and shaving his mustache.

Tuttle took the stand and offered his version of the events on the day of the murder. He testified that he stopped his truck on the side of the off-ramp to take a nap. After awakening from the nap, he left the truck to check the lugnuts before continuing his journey. At that point, he discovered Merrick's lifeless, bloody body in her car, which was parked behind his truck. He stated that he fled because he had a criminal record and feared that he

would be wrongly accused. The State elicited testimony from several witnesses that Tuttle had told them either that his trip was uneventful or that he fled first from the crime scene and later from Evanston because he was suspected of running a car off the road.

The chief evidence presented to exculpate Tuttle was the testimony of a witness who claimed to have been in the Parley's Summit area scouting for elk when he first saw Tuttle's truck alone on the off-ramp. Approximately fifteen minutes later, the witness looked at the off-ramp again and saw that a car like the victim's had appeared. He claimed that he saw legs extending from the car and Tuttle, whom he later recognized, running, apparently in horror, from the small light-colored vehicle. Cross-examination revealed that after the witness had spent two weeks in jail with Tuttle, he offered his testimony to the State in exchange for concessions in his own criminal case. An investigator for the State testified that he had attempted to verify the witness's story by going to the spot from which the witness claimed to have viewed the murder scene and found it impossible, even using the witness's binoculars, to discern the gender of a person at the scene, let alone the person's identity or facial expressions. The State also established that the witness was a restricted person who could not legally have participated in the elk hunt for which he claimed to be preparing.[1]

Tuttle proffered his wife's testimony that he had shaved on September 24th before he left for California and therefore could not have grown a noticeable beard by the 26th. Tuttle called witnesses who saw a white car with a van or with a truck that had a box rather than a flatbed trailer. He called an expert on the reliability of eyewitness testimony who explained the factors that affect the reliability of such testimony. *See State v. Long,* 721 P.2d 483, 487–95 & nn. 7, 8 (Utah 1986). He also called an expert who challenged the State's evidence that the hair found at the scene was compatible with Tuttle's by testifying that the comparison was inconclusive. During cross-examination, however, it was revealed that the expert claimed membership in a professional society that did not list him among its members.[2]

The jury returned a verdict of guilt on the first degree murder charge. Tuttle had earlier waived his right to have a jury decide whether he should receive a death sentence. The judge did not impose death but sentenced Tuttle to life imprisonment.

On appeal, Tuttle challenges the conviction on three grounds. He first claims that the trial court erred in denying his motion for a jury that was not "death qualified." He also claims that hypnotically enhanced testimony should not have been admitted, but that once it was, expert testimony on its reliability should not have been excluded. Lastly, he attacks the constitutionality of the first degree murder statute. We will treat each of these claims separately.

■ Tuttle first claims that he was entitled to a non-death-qualified jury. Some background is required. Utah Rule of Criminal Procedure 18(e)(10) provides that when capital murder is charged and a jury is impaneled, the trial court is to remove from the venire those who would refuse to vote to impose the death penalty for reasons of conscience.[3] *See generally State v.*

---

1. A restricted person may not own or have a dangerous weapon in his possession, custody, or control. Individuals convicted of crimes of violence are restricted persons. *See* Utah Code Ann. § 76–10–503(1) (1978 & Supp.1988).

2. None of the evidence described up to this point was hypnotically enhanced.

3. The removal for cause of prospective jurors who indicate that because of conscientious objection they will not impose the death penalty even if they find facts warranting its imposition is termed "death qualifying" the jury. Utah

Rule of Criminal Procedure 18(e)(10) provides in part as follows: "If the offense charged is punishable [by] death, the entertaining of such conscientious opinions about the death penalty as would preclude the juror from voting to impose the death penalty following conviction regardless of the facts [is cause for excluding the juror]." Utah R.Crim.P. 18(e)(10) (codified at Utah Code Ann. § 77–35–18(e)(10) (1982)). Death qualification is proper only if the jury will determine the penalty. *See* Utah R.Crim.P. 18(e)(10) (codified at Utah Code Ann. § 77–35–18(e)(10) (1982)).

*Schreuder,* 726 P.2d 1215, 1225–26 (Utah 1986); *State v. Moore,* 697 P.2d 233, 237–38 (Utah 1985). Before a jury was selected, Tuttle asked that the court not death-qualify the jury as required by rule 18(e)(10). He argued that death-qualified juries are unconstitutional because they are more prone to convict during the guilt phase of the trial and because they do not represent a fair cross-section of the population.[4] When the trial court denied the motion, Tuttle informed the court that in order to avoid having his guilt determined by a death-qualified jury, he would waive his right to a jury in the penalty phase. *See* Utah Code Ann. § 76–3–207(1) (Supp.1988). Because the judge would then determine the penalty, rule 18(e)(10) became inapplicable and the trial court impaneled a non-death-qualified jury for the guilt phase. This jury returned a verdict of guilt and was excused. The trial judge heard the evidence presented during the penalty phase and imposed a life sentence, the more lenient of the two possible sentences for first degree murder. *See* Utah Code Ann. §§ 76–3–206(1), 76–5–202(2) (1978 & Supp.1988). Despite having received the most lenient sentence allowed for first degree murder, Tuttle claims that the trial court erred in "forcing" him to waive his right to a jury in the penalty phase by denying his motion for a non-death-qualified jury.

Whatever the merits of Tuttle's claim, we will not consider it if he lacks standing to raise it. Standing is an issue that a court can raise *sua sponte* at any time. *E.g., Society of Professional Journalists v. Bullock,* 743 P.2d 1166, 1169 (Utah 1987); *Utah Restaurant Ass'n v. Davis County Bd. of Health,* 709 P.2d 1159, 1160 (Utah 1985). To have standing, Tuttle must have "suffered some distinct and palpable injury that gives him a personal stake in the outcome." *Jenkins v. Swan,* 675 P.2d 1145, 1148 (Utah 1983) (citations omitted); *accord Society of Professional Journalists,* 743 P.2d at 1170; *Utah Restaurant Ass'n,* 709 P.2d at 1162. Determination of the question does not require lengthy analysis. Tuttle was not tried by a death-qualified jury and suffered no "injury" by reason of his forced choice because he received the most lenient sentence a jury could have recommended. He therefore lacks standing to raise the fair cross-section and propensity-to-convict issues. *See Jenkins,* 675 P.2d at 1151. For these reasons, we do not reach his claim.[5]

Tuttle's second group of claims relates to the hypnotically enhanced testimony[6] of one witness. He contends that the trial court erred when it permitted a witness to testify to matters that the witness "remembered" only after undergoing hypnosis. He also claims that it was error to exclude proffered expert testimony on the unreliability of hypnotically enhanced testimony.

■ We first address the propriety of admitting the hypnotically enhanced testimony. Before he was hypnotized, the witness in question gave a statement indicat-

---

4. Tuttle bases these claims on the federal constitution's guarantees of trial by an impartial jury, freedom from cruel and unusual punishment, and due process. *See* U.S. Const. amends. VI, VIII, XIV. He also cites article I, sections 7, 9, and 12 of the Utah Constitution but has failed to brief the state constitutional issues separately. We therefore address only his federal constitutional claims. *See, e.g., State v. Lafferty,* 749 P.2d 1239, 1247 n. 5 (Utah 1988); *State v. Earl,* 716 P.2d 803, 805–06 (Utah 1986).

5. We note that since Tuttle filed his brief, the United States Supreme Court has considered and rejected the same claims of federal constitutional error that Tuttle has attempted to raise here regarding death-qualified juries. *See Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986).

6. Testimony of post-hypnotic recall has been referred to by various names, most notably "hypnotically *refreshed* testimony." *See, e.g.,* National Institute of Justice Issues and Practices, *Hypnotically Refreshed Testimony: Enhanced Memory or Tampering with Evidence?* (January 1985) [hereinafter National Institute of Justice]. We find "hypnotically *enhanced* testimony" to be a more accurate descriptive term because "enhanced" denotes "augmented," while "refreshed" denotes "revived." *See Webster's New International Dictionary* 849, 2095 (2d ed. 1954). Scientific research suggests that in many cases, hypnosis does not simply revive dormant memories, but augments a witness's actual memories by adding false or pseudo memories to them. *See, e.g.,* National Institute of Justice at 1–2, 5–11, 14–24, 26.

ing that he had seen a glossy black flatbed truck with something written on its doors towing a small car with an uncomfortable-looking girl in it. He also said that he saw the truck pulled off at the Summit Park exit and that the truck driver was a "scroungy" man wearing a dark baseball cap and a light blue shirt, clothing similar to what Tuttle was wearing when he arrived in Evanston. Under hypnosis, the witness stated that the truck's bug screen had the word "Apache" on it, gave a more complete description of the car and Tuttle, and "recalled" many additional details that were conflicting and internally inconsistent.

At trial, Tuttle's counsel objected to the witness's testifying to any information "recalled" for the first time after being hypnotized; he sought to limit the witness's testimony to his prehypnotic statements. The trial judge overruled this objection and admitted the testimony. The witness testified to details from both his pre- and post-hypnotic recollections. The witness also identified Tuttle as the driver of the truck, even though he had never done so before the trial.[7]

We have never had occasion to pass on the admissibility of hypnotically enhanced testimony. *See Mulherin v. Ingersoll–Rand Co.,* 628 P.2d 1301, 1302 (Utah 1981) (declining to comment on the admissibility of such testimony). Over the course of the last twenty years or so, courts across the nation have taken different approaches to this issue at different times. Initially, the courts displayed a tendency to admit such evidence, accepting it as "scientific" and reliable. *See, e.g., Harding v. State,* 5 Md.App. 230, 236, 246 A.2d 302, 306 (1968), *cert. denied,* 395 U.S. 949, 89 S.Ct. 2030, 23 L.Ed.2d 468 (1969); *State v. McQueen,* 295 N.C. 96, 119, 244 S.E.2d 414, 427 (1978). However, after a period of time this trend was reversed as the results of carefully controlled scientific studies accumulated. The later decisions tended to exclude such evidence and to permit witnesses to testify only to their prehypnotic recall. *See, e.g., State v. Peoples,* 311 N.C. 515, 518–33, 319

S.E.2d 177, 179–88 (1984) (overruling *McQueen* ); *State v. Collins,* 296 Md. 670, 464 A.2d 1028 (1983) (overruling *Harding* ); *Polk v. State,* 48 Md.App. 382, 427 A.2d 1041 (1981) (modifying *Harding* ).

This trend toward inadmissibility has gathered considerable momentum and now represents the undisputed direction of the law in this area. *See, e.g., Prewitt v. State,* 460 So.2d 296, 304 (Ala.Crim.App. 1984); *Rock v. State,* 288 Ark. 566, 568–70, 708 S.W.2d 78, 79–80 (1986), *rev'd on other grounds,* 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987); *State v. Atwood,* 39 Conn.Supp. 273, 479 A.2d 258, 262–64 (Conn. Super.Ct.1984); *State v. Haislip,* 237 Kan. 461, 482–83, 701 P.2d 909, 925 (1985); *People v. Gonzales,* 415 Mich. 615, 626, 329 N.W.2d 743, 747 (1982), *modified on other grounds,* 417 Mich. 1129, 336 N.W.2d 751 (1983); *Alsbach v. Bader,* 700 S.W.2d 823, 830 (Mo.1985) (en banc); *People v. Hughes,* 59 N.Y.2d 523, 539, 545, 453 N.E.2d 484, 492, 495, 466 N.Y.S.2d 255, 263, 266 (1983); *State v. Peoples,* 311 N.C. 515, 529–31, 319 S.E.2d 177, 186–87 (1984) (citing Note, *Pretrial Hypnosis and its Effect on Witness Competency in Criminal Trials,* 62 Neb.L.Rev. 336, 346 (1983)). Only a few recent decisions permit the admission of hypnotically enhanced testimony, even on a case-by-case basis. *See, e.g., State v. Brown,* 337 N.W.2d 138 (N.D.1983); *State v. Wren,* 425 So.2d 756 (La.1983); *State v. Hurd,* 86 N.J. 525, 432 A.2d 86 (1981); *State v. Armstrong,* 110 Wis.2d 555, 329 N.W.2d 386, *cert. denied,* 461 U.S. 946, 103 S.Ct. 2125, 77 L.Ed.2d 1304 (1983); *Chapman v. State,* 638 P.2d 1280 (Wyo.1982).

At least twenty-five states and one federal circuit exclude hypnotically enhanced testimony. *United States v. Valdez,* 722 F.2d 1196 (5th Cir.1984); *Prewitt v. State,* 460 So.2d 296 (Ala.Crim.App.1984); *Contreras v. State,* 718 P.2d 129 (Alaska 1986); *State ex rel. Collins v. Superior Court,* 132 Ariz. 180, 644 P.2d 1266 (1982); *State v. Mena,* 128 Ariz. 226, 624 P.2d 1274 (1981); *Rock v. State,* 288 Ark. 566, 708

---

7. It is not clear whether the witness was ever asked to identify Tuttle before the hypnotic session. Thus, we do not know whether the witness could have done so.

S.W.2d 78 (1986), *rev'd on other grounds*, 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987); *People v. Shirley*, 31 Cal.3d 18, 723 P.2d 1354, 181 Cal.Rptr. 243, *cert. denied*, 459 U.S. 860, 103 S.Ct. 133, 74 L.Ed.2d 114 (1982); *People v. Angelini*, 706 P.2d 2 (Colo.Ct.App.1985); *People v. Quintanar*, 659 P.2d 710 (Colo.Ct.App.1982); *State v. Atwood*, 39 Conn.Supp. 273, 479 A.2d 258 (Conn.Super.Ct.1984); *State v. Davis*, 490 A.2d 601 (Del.1985); *Bundy v. State*, 471 So.2d 9 (Fla.1985), *cert. denied*, 479 U.S. 894, 107 S.Ct. 295, 93 L.Ed.2d 269 (1986); *Walraven v. State*, 255 Ga. 276, 336 S.E.2d 798 (1985); *Bobo v. State*, 254 Ga. 146, 327 S.E.2d 208 (1985); *Peterson v. State*, 448 N.E.2d 673 (Ind.1983); *Strong v. State*, 435 N.E.2d 969 (Ind.1982); *State v. Seager*, 341 N.W.2d 420 (Iowa 1983); *State v. Haislip*, 237 Kan. 461, 701 P.2d 909 (1985); *State v. Collins*, 296 Md. 670, 464 A.2d 1028 (1983); *Commonwealth v. Kater*, 388 Mass. 519, 447 N.E.2d 1190 (1983); *People v. Gonzales*, 415 Mich. 615, 329 N.W.2d 743 (1982), *modified*, 417 Mich. 1129, 336 N.W.2d 751 (1983); *State v. Mack*, 292 N.W.2d 764 (Minn.1980); *Alsbach v. Bader*, 700 S.W.2d 823 (Mo.1985) (en banc); *State v. Patterson*, 213 Neb. 686, 331 N.W.2d 500 (1983); *State v. Palmer*, 210 Neb. 206, 313 N.W.2d 648 (1981); *People v. Hughes*, 59 N.Y.2d 523, 453 N.E.2d 484, 466 N.Y.S.2d 255 (1983); *State v. Peoples*, 311 N.C. 515, 319 S.E.2d 177 (1984); *Harmon v. State*, 700 P.2d 212 (Okla.Crim.App.1985); *Robison v. State*, 677 P.2d 1080 (Okla.Crim.App. 1984); *Commonwealth v. Smoyer*, 505 Pa. 83, 476 A.2d 1304 (1984); *Commonwealth v. Nazarovitch*, 496 Pa. 97, 436 A.2d 170 (1981); *Greenfield v. Commonwealth*, 214 Va. 710, 204 S.E.2d 414 (1974); *State v. Coe*, 109 Wash.2d 832, 750 P.2d 208 (1988) (en banc); *State v. Martin*, 101 Wash.2d 713, 684 P.2d 651 (1984) (en banc); *State v. Laureano*, 101 Wash.2d 745, 682 P.2d 889 (1984) (en banc); *State v. Coe*, 101 Wash.2d 772, 684 P.2d 668 (1984) (en banc).

The courts that have excluded admission of hypnotically enhanced testimony have done so on grounds that such testimony is unreliable. They have noted that the relevant scientific community does not accept forensic hypnosis as a dependable method of refreshing recollection. Or, they have reasoned that despite the lack of scientific acceptance, there is a great danger that jurors will give undue credence to such "scientifically enhanced" testimony. *See, e.g., Prewitt v. State*, 460 So.2d 296, 301–04 (Ala.Crim.App.1984); *Contreras v. State*, 718 P.2d 129, 134–36 (Alaska 1986); *State ex rel. Collins v. Superior Court*, 132 Ariz. 180, 183–86, 195–99, 201, 208–09, 644 P.2d 1266, 1269–72, 1281–85, 1287, 1294–95 (1982); *Rock v. State*, 288 Ark. 566, 570–72, 708 S.W.2d 78, 80 (1986), *rev'd on other grounds*, 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987); *People v. Shirley*, 31 Cal.3d 18, 40, 51–66, 723 P.2d 1354, 1366, 1373–83, 181 Cal.Rptr. 243, 256, 263–72 (1982); *People v. Quintanar*, 659 P.2d 710, 711–12 (Colo.Ct.App.1982); *State v. Atwood*, 39 Conn.Supp. 273, 479 A.2d 258, 261, 262–64 (Conn.Super.Ct.1984); *State v. Davis*, 490 A.2d 601, 603–05 (Del. 1985); *Bundy v. State*, 471 So.2d 9, 13–18 (Fla.1985), *cert. denied*, 479 U.S. 894, 107 S.Ct. 295, 93 L.Ed.2d 269 (1986); *Walraven v. State*, 255 Ga. 276, 280–82, 336 S.E.2d 798, 802–03 (1985); *Bobo v. State*, 254 Ga. 146, 148, 327 S.E.2d 208, 211 (1985); *Peterson v. State*, 448 N.E.2d 673, 675–79 (Ind.1983); *State v. Haislip*, 237 Kan. 461, 478–79, 482, 701 P.2d 909, 923–24, 926 (1985); *State v. Collins*, 296 Md. 670, 676–78, 701–03, 464 A.2d 1028, 1032–34, 1044–45 (1983); *Commonwealth v. Kater*, 388 Mass. 519, 520, 524–28, 533–34, 447 N.E.2d 1190, 1193, 1195–97, 1200 (1983); *People v. Gonzales*, 415 Mich. 615, 622–27, 329 N.W.2d 743, 745–48 (1982); *State v. Mack*, 292 N.W.2d 764, 767–72 (Minn.1980); *Alsbach v. Bader*, 700 S.W.2d 823, 824, 828–29 (Mo.1985) (en banc); *State v. Patterson*, 213 Neb. 686, 690–91, 331 N.W.2d 500, 503 (1983); *State v. Palmer*, 210 Neb. 206, 217–18, 313 N.W.2d 648, 654–55 (1981); *People v. Hughes*, 59 N.Y.2d 523, 536–45, 453 N.E.2d 484, 490–95, 466 N.Y.S.2d 255, 261–66 (1983); *State v. Peoples*, 311 N.C. 515, 529, 531–33, 319 S.E.2d 177, 185, 187–88 (1984); *Harmon v. State*, 700 P.2d 212, 214 (Okla.Crim.App.1985); *Robison v. State*, 677 P.2d 1080, 1085 (Okla.Crim.App. 1984), *cert. denied*, 467 U.S. 1246, 104 S.Ct. 3524, 82 L.Ed.2d 831 (1984); *Common-*

wealth v. Natzarovich, 496 Pa. 97, 101–11, 436 A.2d 170, 172–78 (1981); Greenfield v. Commonwealth, 214 Va. 710, 715–16, 204 S.E.2d 414, 419 (1974); State v. Martin, 101 Wash.2d 713, 719–24, 684 P.2d 651, 654–57 (1984).

The scientific community's current rejection of hypnotically enhanced testimony is apparently based on a rejection of the view that the mind is a camera or tape recorder from which historical events can be retrieved by simply pushing a button accessible under hypnosis. See, e.g., United States v. Valdez, 722 F.2d 1196, 1200 (5th Cir.1984) (citing Orne, The Use and Misuse of Hypnosis in Court, 27 Int'l J. Clinical and Experimental Hypnosis 311, 321 (1979) [hereinafter Use and Misuse]; Putnam, Hypnosis and Distortions in Eyewitness Memory, 27 Int'l J. Clinical and Experimental Hypnosis 437, 439–40 (1979) [hereinafter Putnam]); People v. Shirley, 31 Cal.3d 18, 57, 723 P.2d 1354, 1377, 181 Cal.Rptr. 243, 266 (1982) (citing M. Reiser, Handbook of Investigative Hypnosis ch. 40 (1980); Reiser, Hypnosis as a Tool in Criminal Investigation, The Police Chief, at 36, 40 (Nov.1986); Reiser, Hypnosis as an Aid in a Homicide Investigation, 17 Am.J.Clinical Hypnosis 84, 85 (1974)). Current scientific thought holds that the mind's memory and recall functions are much more complex and much less accurate than previously thought. See, e.g., Valdez, 722 F.2d at 1200 (citing F. Bartlett, Remembering 203–05, 309–13 (1964) [hereinafter F. Bartlett]; Use and Misuse at 321; Putnam at 437); People v. Shirley, 31 Cal.3d at 31, 57–66, 723 P.2d at 1361, 1377–83, 181 Cal.Rptr. at 250, 266–72 (citing, inter alia, F. Bartlett at 203–05, 213, 312; D. Hintzman, The Psychology of Learning and Memory 298, 301–04 (1978); E. Loftus, Eyewitness Testimony 56, 60, 70–74, 78, 84–87, 90–94, 97–98, 101, 109, 115, 117–18 (1979); Loftus & Loftus, On the Permanence of Stored Information in the Human Brain, 35 Am. Psychologist 409 (1980); Hilgard & Loftus, Effective Interrogation of the Eyewitness, 27 Int'l J. Clinical & Experimental Hypnosis 342, 346–51 (1979)). The current skeptical approach to hypnotically enhanced evidence is fully in accord with this Court's recognition of the modern reconstructive theory of memory in State v. Long, 721 P.2d 483, 488–90, 494 n. 8 (Utah 1986).

Virtually all of the courts that have held hypnotically enhanced testimony inadmissible have grounded their decisions, at least in part, on the failure to satisfy a threshold requirement that proffered scientific evidence must be shown to be reliable before it can be admitted. These courts have phrased this threshold requirement in terms of either one version or another of the Frye general acceptance test or some other analogous reliability test. Under Frye v. United States, 293 F. 1013 (D.C. Cir.1923), testimony based on a novel scientific procedure is admissible only if the underlying scientific principles are generally accepted within the relevant scientific community.

We agree with the majority of courts which have considered the issue that hypnotically enhanced testimony should not be admitted into evidence. At the present time, the inherent unreliability of such testimony is well established by the cases and articles cited above and by a comprehensive 1985 study commissioned by the United States Department of Justice. See National Institute of Justice Issues and Practices, Hypnotically Refreshed Testimony: Enhanced Memory or Tampering with Evidence? 1 (January 1985) ("[T]he heavy weight of scientific evidence disfavors reliance on 'hypnotically refreshed' eyewitness testimony."). The studies reported in the cited articles amply demonstrate that such testimony cannot meet the Frye test or any other threshold reliability test for scientifically adduced evidence.

The State, however, contends that neither the Frye test nor any similar threshold reliability test may properly be used to exclude hypnotically enhanced testimony. This argument is based on the claim that all such tests apply only to expert testimony and hypnotically enhanced testimony is not the testimony of an expert but of a lay eyewitness. See, e.g., United States v. Valdez, 722 F.2d 1196, 1200–01 (5th Cir. 1984).

We reject the State's argument. It is based on an unrealistically literal reading of the *Frye* test and analogous threshold reliability requirements. Other courts have been of the same view. *E.g., State ex rel. Collins v. Superior Court,* 132 Ariz. 180, 197–98, 644 P.2d 1266, 1283–84 (1982); *People v. Shirley,* 31 Cal.3d 18, 53, 723 P.2d 1354, 1375, 181 Cal.Rptr. 243, 264 (1982); *Commonwealth v. Kater,* 388 Mass. 519, 525–28, 447 N.E.2d 1190, 1195–97 (1983); *People v. Gonzales,* 415 Mich. 615, 623, 329 N.W.2d 743, 746 (1982) (en banc); *Alsbach v. Bader,* 700 S.W.2d 823, 828–29 (Mo.1985); *State v. Hurd,* 86 N.J. 525, 536–37, 432 A.2d 86, 91–92 (1981); *State v. Martin,* 101 Wash.2d 713, 726, 684 P.2d 651, 658 (1984) (Brachtenbach, J., concurring). The policy of these threshold reliability tests applies to hypnotically enhanced testimony just as much as it applies to the testimony of experts because even if the one actually testifying is a lay witness, the hypnotically enhanced testimony given by the witness is the product of scientific intervention. *See, e.g., Polk v. State,* 48 Md.App. 382, 393–94, 427 A.2d 1041, 1048 (1981); *Alsbach v. Bader,* 700 S.W.2d 823, 828–29 (Mo.1985); *People v. Hughes,* 59 N.Y.2d 523, 543, 453 N.E.2d 484, 494, 466 N.Y.S.2d 255, 265 (1983).

In Utah, the admissibility of expert testimony and scientific evidence is governed by Utah Rule of Evidence 702. *See Kofford v. Flora,* 744 P.2d 1343, 1347 (Utah 1987). We have abandoned exclusive reliance on the *Frye* test. *See Kofford,* 744 P.2d at 1346–48; *Phillips v. Jackson,* 615 P.2d 1228, 1234–35 (Utah 1980). However, we still have a threshold test for the reliability of scientific evidence offered for admission under rule 702. Under *Phillips* and *Kof-*

*ford,* the question is the inherent reliability of the scientific principles and techniques upon which the proffered evidence is based.[8] *Kofford,* 744 P.2d at 1346; *Phillips,* 615 P.2d at 1234. Because at present no showing of reliability can be made with respect to hypnotically enhanced testimony, we follow the clear trend and find it inadmissible under rule 702.[9] Further, because hypnosis makes all subsequent recollections suspect, testimony regarding anything first recalled from the time of the hypnotic session forward is also inadmissible. *See, e.g., People v. Quintanar,* 659 P.2d 710, 711 (Colo.Ct.App.1982).

The State argues that adoption of a rule excluding hypnotically enhanced testimony will put law enforcement on the horns of a dilemma. It claims that if the police or prosecution thinks that some useful leads may be developed by hypnotizing a witness, it will be forced to choose between pursuing those leads and calling the witness at trial. If it performs the hypnosis, it will lose the ability to call the witness at trial; if it does not hypnotize the witness, it may lose a valuable lead.

The State draws an unnecessarily extreme picture. A number of courts have considered this problem and have fashioned a compromise position under which hypnotically enhanced testimony is excluded, yet the prosecution is permitted both to follow leads via hypnosis and to call the previously hypnotized witness at trial. We find this the best course and adopt it. A previously hypnotized witness may take the stand, but the witness's testimony must be limited to his or her prehypnotic recall as it has been recorded before hypnosis.[10] *See, e.g.,*

---

8. Although evidence satisfying the *Frye* standard will meet our threshold reliability test, satisfaction of *Frye* is not the only way to show the requisite reliability. *Kofford v. Flora,* 744 P.2d 1343, 1346–48 (Utah 1987).

9. This holding does not extend to the facts of *Rock v. Arkansas,* 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987). In *Rock,* the United States Supreme Court held that Arkansas's rule excluding hypnotically enhanced testimony, when applied to prevent an accused from testifying to her own post-hypnotic recall, violated her constitutional right to testify on her own behalf.

*See* U.S. Const. amends. V, VI, XIV. That narrow ruling has no application to a case such as this one, where the witness in question is not the accused but a witness for the State. *See State v. Coe,* 109 Wash.2d 832, 838, 750 P.2d 208, 212 (1988).

10. The precise scope of admissible testimony should be determined at a hearing *in limine* whenever a witness has been hypnotized prior to trial. *See, e.g., State v. Haislip,* 237 Kan. 461, 483, 701 P.2d 909, 926 (1985); *People v. Hughes,* 59 N.Y.2d 523, 548, 453 N.E.2d 484, 497, 466 N.Y.S.2d 255, 268 (1983).

*United States v. Valdez*, 722 F.2d 1196, 1204 (5th Cir.1984); *Contreras v. State*, 718 P.2d 129, 139 (Alaska 1986); *State ex rel. Collins v. Superior Court*, 132 Ariz. 180, 209–10, 644 P.2d 1266, 1295–96 (1982); *Rock v. State*, 288 Ark. 566, 575–78, 708 S.W.2d 78, 83–84 (1986), *rev'd on other grounds*, 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987); *People v. Quintanar*, 659 P.2d 710, 713 (Colo.Ct.App.1982); *Bundy v. State*, 471 So.2d 9, 18–19 (Fla.1985), *cert. denied*, 479 U.S. 894, 107 S.Ct. 295, 93 L.Ed.2d 269 (1986); *Walraven v. State*, 255 Ga. 276, 282, 336 S.E.2d 798, 803 (1985); *State v. Seager*, 341 N.W.2d 420, 431 (Iowa 1983); *State v. Collins*, 296 Md. 670, 701–02, 464 A.2d 1028, 1044 (1983); *Commonwealth v. Kater*, 388 Mass. 519, 521, 528–30, 534, 447 N.E.2d 1190, 1193, 1197, 1200 (1983); *State v. Mack*, 292 N.W.2d 764, 771 (Minn.1980); *State v. Patterson*, 213 Neb. 686, 686, 692, 331 N.W.2d 500, 501, 504 (1983); *People v. Hughes*, 59 N.Y.2d 523, 545–46, 453 N.E.2d 484, 495–96, 466 N.Y. S.2d 255, 266 (1983); *State v. Peoples*, 311 N.C. 515, 533–34, 319 S.E.2d 177, 188 (1984); *Harmon v. State*, 700 P.2d 212, 214 (Okla.Crim.App.1985); *Commonwealth v. Smoyer*, 505 Pa. 83, 89–90, 476 A.2d 1304, 1308 (1984); *State v. Martin*, 101 Wash.2d 713, 714, 684 P.2d 651, 652 (1984). Should a previously hypnotized witness improperly stray from the details of his or her recorded prehypnotic recall, the judge may strike such testimony from the record. If it appears to the trial judge that striking is not sufficient to erase the effect of the improper testimony, the record of that prehypnotic testimony can be used to impeach the witness. In such a case, expert testimony could also be admitted to explain the witness's unwarranted confidence in the improper testimony and the unreliability of the post-hypnotic "recollection." *See, e.g., Commonwealth v. Kater*, 388 Mass. 519, 534–35, 447 N.E.2d 1190, 1200 (1983); *People v. Hughes*, 59 N.Y.2d 523, 548, 453 N.E.2d 484, 497, 466 N.Y.S.2d 255, 268 (1983).

In light of our holding, the trial court's admission of testimony that went beyond the record of the witness's prehypnotic recall, including the in-court identification of Tuttle, was error. *See, e.g., Harmon v. State*, 700 P.2d 212, 214–16 (Okla.Crim. App.1985) (reaffirming *Robison v. State*, 677 P.2d 1080 (Okla.Crim.App.), *cert. denied*, 467 U.S. 1246, 104 S.Ct. 3524, 82 L.Ed.2d 831 (1984)); *cf. United States v. Valdez*, 722 F.2d 1196, 1203 (5th Cir.1984) (requiring exclusion of uncorroborated identifications made only after hypnosis on due process, fair trial, and Federal Rule of Evidence 403 grounds).

█ In addition to attacking the admission of the post-hypnotic recollections, Tuttle claims that the trial court erroneously denied his request to proffer expert testimony on the unreliability of hypnotically enhanced testimony. Although the trial court did not expressly deny Tuttle permission to introduce this testimony, it did require that he choose between expert testimony on the unreliability of hypnotically enhanced testimony and expert testimony on the weaknesses of eyewitness testimony in general. The trial judge based this ruling on Utah Rule of Evidence 403, which permits the exclusion of relevant evidence "if its probative value is substantially outweighed ... by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Utah R.Evid. 403. After this ruling, Tuttle chose to introduce the testimony about eyewitness testimony in general and forego the testimony about hypnosis.

We agree with Tuttle that the trial court's ruling had the effect of denying him the right to put on testimony regarding hypnotically enhanced testimony. We also find that Tuttle did not waive his objection to the court's ruling by putting on the expert testimony about eyewitness testimony. The trial court apparently saw these two topics as being so closely related that testimony about one would be duplicative of testimony about the other. Although it may appear that these topics are related, "[h]ypnotically refreshed testimony is quite simply, *not* like normal eyewitness testimony." *State v. Peoples*, 311 N.C. 515, 529, 319 S.E.2d 177, 185 (1984). The problems with hypnotically enhanced testimony do not arise from a human wit-

ness's fallibility only, but also from the defects inherent in the process of hypnosis. *Id.; see, e.g., People v. Shirley*, 31 Cal.3d 18, 62–66, 723 P.2d 1354, 1381–83, 181 Cal. Rptr. 243, 270–72 (1982); *Commonwealth v. Smoyer*, 505 Pa. 83, 87, 476 A.2d 1304, 1306 (1984); *State v. Martin*, 101 Wash.2d 713, 727–29, 684 P.2d 651, 658–59 (1984) (Brachtenbach, J., concurring). It is unreasonable to assume that an explanation of the potential problems with eyewitness testimony will enable a fact finder to understand the problems inherent in hypnotically enhanced testimony and to adequately evaluate such evidence. Therefore, the trial court erred in concluding that expert testimony on either topic would be sufficiently interchangeable with testimony on the other to warrant requiring an election by the accused. Tuttle should have been permitted to put on testimony addressed to both topics.

■ Tuttle claims that these errors—admission of the hypnotically enhanced testimony and exclusion of expert testimony on the reliability of that evidence—violated his federal constitutional rights to confront the witnesses against him and to present evidence on his own behalf. *See United States v. Valdez*, 722 F.2d 1196, 1202 (5th Cir.1984); *Contreras v. State*, 718 P.2d 129, 138–39 (Alaska 1986); *State ex rel. Collins v. Superior Court*, 132 Ariz. 180, 183, 644 P.2d 1266, 1269, 1273–75 (1982); *Peterson v. State*, 448 N.E.2d 673, 678 (Ind.1983); U.S. Const. amends. V, VI, XIV.[11] He also contends that those errors were harmful and warrant reversal.

We need not determine whether these errors violated Tuttle's federal constitutional rights, as opposed to simply amounting to evidentiary errors under state law, *see State v. Hackford*, 737 P.2d 200, 204–05 (Utah 1987), because we find that the errors were harmless, even when judged by the federal constitutional harmless error standard.[12] *See, e.g., State v. Bishop*, 753 P.2d 439, 500 (Utah 1988) (Zimmerman, J., concurring, joined by Stewart and Durham, JJ.); *State v. Hackford*, 737 P.2d at 205.

Errors amounting to violations of the federal constitution require reversal unless they are harmless beyond a reasonable doubt. Under the current Supreme Court articulation of that standard, an error is harmless if the overwhelming evidence of guilt makes it unlikely beyond a reasonable doubt that the result would have been different absent the error. *See, e.g., Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986); *Bishop*, 753 P.2d at 500–01 (Zimmerman, J., concurring, joined by Stewart and Durham, JJ.); *State v. Hackford*, 737 P.2d at 205 & n. 3 (citing *The Supreme Court, 1985 Term—Leading Cases*, 100 Harv.L.Rev. 100, 114–15 (1986)). Whether an error in the admission of testimony offered by the State or in the exclusion of testimony offered by the accused is harmless under that standard depends on many factors. Those factors include the importance of the witness's testimony, whether the testimony was cumulative, whether the testimony was corroborated or contradicted, and the overall strength of the State's case. *Hackford*, 737 P.2d at 205 (quoting *Van Arsdall*, 475 U.S. at 684, 106 S.Ct. at 1438); *see* 4 W. LaFave, *Search and Seizure: A*

---

**11.** Tuttle also cites the confrontation and due process provisions of the state constitution, Utah Const. art. I, §§ 7, 12, but has failed to brief his claims based on those provisions separately. For that reason, we address his federal constitutional claims only. *See, e.g., State v. Lafferty*, 749 P.2d 1239, 1247 n. 5 (Utah 1988); *State v. Earl*, 716 P.2d 803, 805–06 (Utah 1986).

**12.** Utah Rule of Evidence 103 and Utah Rule of Criminal Procedure 30 set the harmless error standard for nonconstitutional evidentiary errors. *See State v. Eldredge*, 773 P.2d 29, 35 n. 9 (Utah 1989); *State v. Bishop*, 753 P.2d 439, 499 (Utah 1988) (Zimmerman, J., concurring);

*State v. Hackford*, 737 P.2d 200, 204 n. 1 (Utah 1987); *State v. Knight*, 734 P.2d 913, 919–20 (Utah 1987); *State v. Rammel*, 721 P.2d 498, 500 (Utah 1986); Utah R.Evid. 103; Utah R.Crim.P. 30. Under that standard, which is not as strict as the federal constitutional standard, *see Bishop*, 753 P.2d at 500 (Zimmerman, J., concurring); *Hackford*, 737 P.2d at 204, an error requires reversal only if there is "a reasonable likelihood of a more favorable result" for the accused had the error not occurred. *E.g., Knight*, 734 P.2d at 919. A reasonable likelihood of a more favorable outcome exists if our confidence in the result of the trial is eroded. *Id.* at 920.

*Treatise on the Fourth Amendment* § 11.7(e), at 529–31 (2d ed.1987).

In the present case, analysis of these factors leads to the conclusion that the errors were harmless beyond a reasonable doubt. The hypnotized witness's testimony was not important to the State's case when considered in light of the other evidence. Except for the hypnotized witness's in-court identification of Tuttle as the driver of the truck, the testimony was cumulative because several other witnesses also placed the Apache truck in the vicinity of the murder and saw it towing the victim's car.

The witness's identification of Tuttle as the driver of the Apache truck would appear at first glance to be critical. However, both Tuttle and his acquaintance who purported to take the stand for the State testified that Tuttle was the driver of the Apache truck and placed him at the murder scene. Tuttle contended that he did not see the victim alive. He claimed that he was asleep in his truck when the murder occurred and that he was startled to discover the body later in a car parked behind his truck. Therefore, the positive identification of Tuttle as the driver of the truck is of far less importance than would first appear.

As for Tuttle's claim that he discovered the body only after the killing, the State's evidence showed his version of the events to be improbable and inconsistent. For example, Tuttle claimed that after making a call to his home base from American Fork, he drove up Parley's Canyon, parked, and went to sleep. However, the State demonstrated that Tuttle could not have arrived at the scene at the time he claimed unless he traveled from American Fork to the summit of Parley's Canyon, a distance of over forty-five miles that includes some of the most heavily traveled freeway in Utah and more than ten miles of steep grade, at an average of ninety miles per hour. In addition, one witness identified a photograph of Tuttle's truck as the truck he had seen when he saw a man matching Tuttle's description push a woman into a small white car at the murder scene. And yet another witness testified that he saw a truck matching the description of Tuttle's towing a small, light-colored car in the area. The hypnotized witness's prehypnotic testimony paralleled the testimony of these witnesses.

All of this testimony, when considered with the evidence that a strand of hair compatible with Tuttle's was found in the victim's car, that Tuttle had a knife consistent with the victim's wounds and a chain which could have been used to tow her car and which would have produced marks consistent with those found on the car, that he fled both the crime scene and Evanston, and that he changed his appearance, indicates that the State's case against Tuttle was very strong, albeit circumstantial. *See Robison v. Maynard,* 829 F.2d 1501, 1507 (10th Cir.1987). We conclude that it is beyond reasonable doubt that the result would have been the same absent the error that led to the admission of the hypnotically enhanced testimony. *Compare Robison v. State,* 677 P.2d 1080, 1085 (Okla.Crim. App.) (erroneous admission of post-hypnotic identification was harmless because the other evidence, although circumstantial, was overwhelming), *cert. denied,* 467 U.S. 1246, 104 S.Ct. 3524, 82 L.Ed.2d 831 (1984) *with Harmon v. State,* 700 P.2d 212, 214, 216–17 (Okla.Crim.App.1985) (erroneous admission of post-hypnotic identification was not harmless beyond a reasonable doubt because the only other evidence against Harmon was inconclusive hair evidence and two reports of damaging admissions).

We now consider the harmfulness of the exclusion of the proffered expert witness's testimony regarding the unreliability of hypnotically enhanced testimony. Again, this evidence may at first appear to have been fairly important to Tuttle's case because it would have helped to discredit the hypnotized witness's identification of the truck and of Tuttle. However, since we find the erroneous admission of that evidence harmless, the erroneous exclusion of evidence that might have undermined it is also harmless.

Tuttle's third set of claims is directed at section 76–5–202(1)(q) of the Code, the statute that establishes the variant of first

degree murder of which he was convicted. Utah Code Ann. § 76–5–202(1)(q) (Supp. 1988). He contends that it runs afoul of the federal constitution's guarantees of equal protection and due process. *See* U.S. Const. amends. V, XIV.

◼ We first consider the equal protection claim. Section 76–5–202(1)(q) provides that a knowing and intentional killing is first degree murder and is consequently punishable by the death penalty, if "[t]he homicide was committed in an especially heinous, atrocious, cruel, or exceptionally depraved manner, any of which must be demonstrated by physical torture, serious physical abuse, or serious bodily injury [13] of the victim before death." Utah Code Ann. § 76–5–202(1)(q) (Supp.1988). Tuttle claims that this provision denies him equal protection because it allows a prosecutor overly broad discretion to pick from a pool of similarly situated persons who have committed comparable crimes those whom he or she wishes to charge with first degree or capital murder, as opposed to second degree murder. He claims that he was arbitrarily chosen for a capital prosecution.[14]

The mere fact that one criminal episode may arguably violate several criminal statutes, thus giving the prosecutor discretion to choose which of the violations to prosecute, does not deny the accused equal protection of the laws under the federal constitution unless the prosecutor can be shown to have impermissibly discriminated against a particular class of defendants. *United States v. Batchelder*, 442 U.S. 114, 124–25, 99 S.Ct. 2198, 2204–05, 60 L.Ed.2d 755 (1979). Tuttle makes no showing of such discrimination. We therefore find no federal equal protection violation in the prosecution of Tuttle under section 76–5–202(1)(q).

Tuttle also challenges section 76–5–202(1)(q) on due process grounds. He claims that the wording of subpart (q) is impermissibly vague because it permits virtually any intentional killing to be charged as a first degree or capital murder. Tuttle argues that capital murder must be defined more narrowly so that the death penalty can be imposed only for commission of a discrete category of intentional murders. He contends that subpart (q)'s requirement of "serious physical abuse" or "serious bodily injury of the victim before death" does not significantly limit the number of murders that can be charged as capital. Any intentional killer who inflicts a severe blow or wound before the victim dies could be prosecuted under subpart (q), even if only one blow or wound is inflicted and is the cause of death. Conceivably, only a killing committed by a single blow or wound that causes instantaneous death would not qualify for prosecution under this subpart. So read, Tuttle argues, subpart (q) makes almost any murder chargeable as a capital murder.

◼ Because Tuttle was sentenced to life imprisonment rather than the death penalty, he lacks standing to claim that subpart (q) violates the eighth amendment's prohibition of cruel and unusual punishment. *See generally Society of Professional Journalists v. Bullock*, 743 P.2d 1166, 1170 (Utah 1987); *Utah Restaurant Ass'n v. Davis County Bd. of Health*, 709 P.2d 1159, 1162 (Utah 1985); *Jenkins v. Swan*, 675 P.2d 1145, 1148, 1151 (Utah 1983). However, in our statutory scheme, subpart (q) constitutes both an element of first degree murder for which life imprisonment may be imposed and a statutory aggravating factor justifying imposition of the death penalty. *See State v. Tillman*, 750 P.2d 546, 569–70 (Utah 1987); Utah Code Ann. §§ 76–5–202(1)(q), (2) (Supp.

13. "Serious bodily injury" is defined by section 76–1–601(9) of the Code as "bodily injury that creates or causes serious permanent disfigurement, protracted loss or impairment of the function of any bodily member or organ or creates a substantial risk of death." Utah Code Ann. § 76–1–601(9) (1978).

14. Tuttle has not alleged that the State used any impermissible classification, such as race or gender, in choosing to charge him with first rather than second degree murder. *See Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439–41, 105 S.Ct. 3249, 3254–55, 87 L.Ed.2d 313 (1985); *Mountain Fuel Supply v. Salt Lake City Corp.*, 752 P.2d 884, 888 n. 3 (Utah 1988).

1988), 76-3-206(1) (1978). Thus, the language of subpart (q) must serve two distinct functions. Although some may argue that this could be accomplished by placing two different interpretations on the same language, it seems a far more practical and reasonable approach to the statute's construction to seek a single interpretation that can perform both functions constitutionally. For that reason, we find it appropriate to treat Tuttle's due process vagueness challenge to the language of subpart (q) by turning to authorities that analyze challenges to similar provisions on grounds of both cruel and unusual punishment and due process.

A review of the situation as it existed prior to the enactment of section 76-5-202(1)(q) will assist in determining the proper meaning to be accorded the language of subpart (q). Before section 76-5-202(1)(q) was enacted, this Court decided *State v. Wood,* 648 P.2d 71 (Utah 1981), *cert. denied,* 459 U.S. 988, 103 S.Ct. 341, 74 L.Ed.2d 383 (1982). In *Wood,* the trial court had imposed the death penalty because of the "ruthlessness and brutality of the murder." 648 P.2d at 85. We reversed, holding that the death penalty was improperly imposed under the circumstances of the case. We held that if a factor such as the "ruthlessness" or "brutality" of a murder were to be used for the purpose of identifying a class of murders for which the punishment could be death, that class would have to "be limited to those murders involving an aggravated battery or torture." *Id.* at 86. We based our decision on *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), which "held that such an aggravating factor had to be narrowed to meet constitutional standards because, as applied, it was so broad as to describe all murders, and because it described all murders, it allowed the jury unlimited discretion in imposing the death penalty." *Wood,* 648 P.2d at 86.

Two years after *Wood* was decided, the legislature enacted section 76-5-202(1)(q). *See* 1983 Utah Laws ch. 93. Its language reflects a careful effort to codify the standard articulated in *Godfrey* and *Wood.*

One commentator has praised the Utah statute as the one among twenty-four similar statutes in the country that is best tailored to satisfy the *Godfrey–Wood* standard. Rosen, *The "Especially Heinous" Aggravating Circumstance in Capital Cases—The Standardless Standard,* 64 N.C.L.Rev. 941, 943 & n. 7, 991 (1986) [hereinafter Rosen]. Most, if not all, of those statutes merely provide that a murder committed in an especially heinous, atrocious, cruel, or depraved manner may be classified as capital. *See* Rosen at 943 n. 7. Subpart (q) contains additional language apparently intended to define this factor: "any of which must be demonstrated by physical torture, serious physical abuse, or serious bodily injury of the victim before death." Utah Code Ann. § 76-5-202(1)(q) (Supp.1988). Nevertheless, the *Godfrey–Wood* standard is a difficult concept to express, and despite the legislature's best efforts, Tuttle is correct in observing that if subpart (q) is interpreted too literally, it would include all murders not resulting in instantaneous death. *See Maynard v. Cartwright,* 486 U.S. 356, 108 S.Ct. 1853, 1859, 100 L.Ed.2d 372 (1988); *Godfrey v. Georgia,* 446 U.S. at 428-29, 100 S.Ct. at 1764-65. Such an interpretation would make subpart (q) not only an unconstitutionally vague standard for the imposition of the death penalty under *Godfrey* and *Wood,* but also an unconstitutionally vague definition of an element of the crime of first degree murder. *See, e.g., State v. Payton,* 361 So.2d 866, 871 (La. 1978).

*Godfrey* is one of the more recent United States Supreme Court cases which state that the eighth and fourteenth amendments to the federal constitution require every state "to tailor and apply its law in a manner that avoids arbitrary and capricious infliction of the death penalty" and "to define the crimes for which death may be the sentence in a way that obviates 'standardless ... discretion.'" *Godfrey v. Georgia,* 446 U.S. at 428, 100 S.Ct. at 1764 (quoting *Gregg v. Georgia,* 428 U.S. 153, 196 n. 47, 96 S.Ct. 2909, 2936 n. 47, 49 L.Ed.2d 859 (1976) (White, J., concurring)); *see Gregg,* 428 U.S. at 188-89, 96 S.Ct. at

2932; *State v. Wood,* 648 P.2d at 85–86. This must be accomplished by providing a " 'meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not.' " *Gregg v. Georgia,* 428 U.S. at 188, 96 S.Ct. at 2932 (quoting *Furman v. Georgia,* 408 U.S. 238, 313, 92 S.Ct. 2726, 2764, 33 L.Ed.2d 346 (1972) (White, J., concurring)). The first step in determining whether the language of subpart (q) meets these requirements is to interpret that provision. If we can construe it in a manner consistent with the federal constitution's requirements without doing violence to the legislature's intent, we will do so to avoid striking it down. *See, e.g., Carlson v. Bos,* 740 P.2d 1269, 1276 (Utah 1987); *In re Criminal Investigation,* 7th Dist. Ct. No. CS-1, 754 P.2d 633, 640 (Utah 1988); *In re Clatterbuck,* 700 P.2d 1076, 1079–80 (Utah 1985). If the language of subpart (q) is reasonably susceptible to a construction that provides a meaningful distinction between capital and noncapital murders, it does not offend the federal constitution. *See, e.g., Maynard v. Cartwright,* 108 S.Ct. at 1859; *Godfrey,* 446 U.S. at 423, 431–32, 100 S.Ct. at 1762, 1766–67; *Wood,* 648 P.2d at 86.

In *Godfrey,* the United States Supreme Court considered a Georgia statutory provision, section (b)(7), that is analogous to Utah's section 76–5–202(1)(q).[15] The Court held that the Georgia Supreme Court, in affirming a murder defendant's sentence of death, failed to apply a limiting construction to section (b)(7) that the Georgia Supreme Court had developed in earlier decisions. *Godfrey,* 446 U.S. at 431–33, 100 S.Ct. at 1766–67. In reaching this decision, it apparently approved the court's previously articulated limiting construction requiring that the aggravating circumstance specified in that section could not be found absent "torture ... or an aggravated battery" amounting to "serious physical abuse of the victim before death." *Godfrey,* 446 U.S. at 431–32, 100 S.Ct. at 1766–67. Moreover, the "serious physical abuse" was required to "[reflect] a consciousness materially more 'depraved' than that of [other persons] guilty of murder."[16] *Godfrey,* 446 U.S. at 433, 100 S.Ct. at 1767. Thus, the Supreme Court apparently requires not only serious physical abuse before death, but also that any such abuse evidence a mental state materially more depraved or culpable than that of most other murderers. *See Godfrey,* 446 U.S. at 431–33, 100 S.Ct. at 1766–67; Comment, *Godfrey v. Georgia: Possible Effects on Virginia's Death Penalty Law,* 15 U.Rich.L.Rev. 951, 958, 961–62 (1981). Moreover, the physical abuse must be qualitatively and quantitatively different and more culpable than that necessary to accomplish the murder. *See* Comment at 961.

**15.** The Georgia statute provides in relevant part:
   (b) In all cases of other offenses for which the death penalty may be authorized, the judge shall consider, or he shall include in his instructions to the jury for it to consider, any mitigating circumstances or aggravating circumstances otherwise authorized by law and any of the following statutory aggravating circumstances which may be supported by the evidence:
   ...;
   (7) The offense of murder, rape, armed robbery, or kidnapping was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim.
Ga.Code § 27–2534.1(b)(7) (1978). This statute and other similarly worded statutes are widely regarded as essentially identical in substance to statutes that are phrased in terms of heinousness, atrocity, cruelty, and depravity, such as Utah's section 76–5–202(1)(q). *See, e.g., Maynard v. Cartwright,* 486 U.S. 356, 108 S.Ct. 1853, 1859, 100 L.Ed.2d 372 (1988); Mello, *Florida's*

*"Heinous, Atrocious or Cruel" Aggravating Circumstance: Narrowing the Class of Death-Eligible Cases Without Making it Smaller,* 13 Stetson L.Rev. 523, 526–27 (1984); Rosen at 943 & nn. 7–8; Note, *Criminal Procedure: Godfrey v. Georgia and the "Especially Heinous, Atrocious, or Cruel" Murder,* 34 Okla.L.Rev. 337, 337–40 & nn. 9–10, 35 (1981); *cf. State v. Wood,* 648 P.2d at 85–86 (equating the Georgia statute and the nonstatutory aggravating factor, "ruthlessness and brutality"). However, as noted previously, subpart (q) includes additional language that was certainly intended to narrow its application and bring it into conformity with *Godfrey* and *Wood.*

**16.** The United States Supreme Court apparently approved the Georgia Supreme Court's construction of "depravity of mind" as the mental state for inflicting serious physical abuse before death. *Godfrey,* 446 U.S. at 431–32, 100 S.Ct. at 1766–67.

As noted previously, this concept is somewhat difficult to define with great precision.[17] Citation to actual cases may better illustrate both the type of physical abuse and the interconnection between the abuse and a depraved mental state that is required. In *Godfrey*, the Court cited *McCorquodale v. State*, 233 Ga. 369, 211 S.E.2d 577 (1974), as the type of "horrifying torture-murder" properly classifiable as capital because of its heinousness. 446 U.S. at 429–30, 100 S.Ct. at 1765–66. In our own jurisdiction, the infamous Hi-Fi murders are such cases. *See Andrews v. Morris*, 677 P.2d 81, 98 (Utah 1983); *State v. Andrews*, 574 P.2d 709, 709 (Utah 1977); *State v. Pierre*, 572 P.2d 1338, 1343–44 (Utah 1977). Both *McCorquodale* and the Hi-Fi murders involved terrible physical abuse before death that evidenced an intent to cause wholly unnecessary suffering to the victims. In both cases, the form of abuse was demonstrably chosen primarily to torture or maim the victims rather than simply to kill them. These cases illustrate the convergence of physical abuse and depraved mental state that is required.

Having described and illustrated the *Godfrey–Wood* standard, we must now determine whether the application of section 76–5–202(1)(q) to this case meets that standard. This does not require lengthy analysis. The only evidence of heinousness presented at trial was the following: the victim received four deep stab wounds, three of which were potentially fatal in and of themselves; two of those wounds showed evidence of multiple thrusts of the knife, indicating that the victim was stabbed a total of seven times; she also suffered some relatively superficial cuts, scratches, scrapes, and bruises; she may have been conscious for three or four minutes after infliction of the first deep stab wound; and it may have taken her ten or fifteen minutes to die following infliction of

that wound. There was no other evidence on the relative heinousness of the killing.

The State claims that no other evidence is needed. Its position is that a killing committed by means of multiple stabbings that do not cause immediate death can properly be classified as capital on grounds of heinousness. In support of this proposition, the State cites cases in which murders were committed by means of stabbing and death sentences were upheld. *See Morgan v. State*, 415 So.2d 6 (Fla.1982); *Breedlove v. State*, 413 So.2d 1 (Fla.1982) (per curiam); *Foster v. State*, 369 So.2d 928 (Fla. 1979); *Washington v. State*, 362 So.2d 658 (Fla.1978); *State v. Taylor*, 422 So.2d 109 (La.1982); *State v. Moore*, 414 So.2d 340 (La.1982). These citations do not support the State's position. In each case, the facts included other aggravating circumstances that independently supported the imposition of the death penalty. And in each case, the additional aggravating circumstances would provide independent bases for seeking the death penalty under the Utah statute because they fall within one of the subparts of section 76–5–202(1) other than subpart (q). Because the State has cited no case involving only a multiple stabbing, for analytical purposes we are thrown back on the narrow conceptual basis for the constitutionally permissible scope of the heinousness classification that was described in *Godfrey* and *Wood*.

The record contains no evidence that Tuttle intended to do or in fact did anything but kill his victim by stabbing her. Even though this method is gory and distasteful,[18] there is absolutely no evidence that Tuttle had a quicker or less painful method available to him or that he was expert at such matters and intentionally refrained from administering one wound that would have caused instantaneous

---

**17.** We note that the difficulty of defining this standard precisely indicates that careful and detailed jury instructions are essential to the proper determination of whether the element described in subpart (q) has been proven beyond a reasonable doubt. *See Godfrey*, 446 U.S. at 429, 100 S.Ct. at 1765; Donohue, *Godfrey v. Georgia: Creative Federalism, The Eighth*

*Amendment, and the Evolving Law of Death*, 30 Cath.U.L.Rev. 13, 32–40 (1980).

**18.** In *Godfrey*, the Court noted that the gruesomeness of the murder scene is entirely irrelevant to a determination of its heinousness. *See Godfrey*, 446 U.S. at 433 n. 16, 100 S.Ct. at 1767 n. 16.

death in favor of a number of wounds that would prolong the victim's life and suffering. On the facts, there is nothing that could support a finding that this killing falls into the narrow *Godfrey–Wood* category and is sufficiently distinguishable from other intentional killings to make its perpetrator eligible for the death penalty. For these reasons, we find the application of section 76-5-202(1)(q) to the facts of this case contrary to the intention of the statute, as we construe it in light of *Godfrey* and *Wood*.[19]

Subpart (q) was the only aggravating factor supporting the charge of first degree murder against Tuttle, and it was an essential element of the crime. Our conclusion that the evidence cannot support a finding of this factor undermines Tuttle's conviction of first degree murder. Moreover, it is apparent from the record that the State did all it could to prove facts that would support a finding on the subpart (q) element. The State failed to carry this burden, and the record amply demonstrates that it could not do so at a new trial.

█ The State did, however, prove all the elements of the lesser included offense of second degree murder, i.e., an intentional or knowing killing. *See* Utah Code Ann. § 76-5-203(1)(a) (1978 & Supp.1988). The trial court instructed the jury, at Tuttle's request, that it could find him guilty of second degree murder if it found that the State had proven those elements but had failed to prove the element contained in subpart (q). Although the jury did not choose this option, it necessarily found the elements of second degree murder because they are identical to the basic elements of first degree murder, the crime of which the jury did find Tuttle guilty. *Compare* Utah Code Ann. § 76-5-203(1)(a) (1978 & Supp.

1988) *with id.* § 76-5-202(1) (1978 & Supp. 1988). Under these circumstances, we conclude that no purpose would be served by a retrial on either a first or a second degree murder charge. We therefore simply reverse Tuttle's conviction and sentence for first degree murder and remand this case to the trial court with instructions to enter a conviction and sentence for second degree murder. *See State v. Bolsinger,* 699 P.2d 1214, 1221 (Utah 1985); *State v. Bindrup,* 655 P.2d 674, 676 (Utah 1982); Utah Code Ann. § 76-1-402(5) (1978).[20]

We have considered Tuttle's other arguments and find them to be without merit. The conviction is reversed, and the case is remanded to the trial court with instructions to enter a conviction and sentence for second degree murder.

HALL, C.J., HOWE, Associate C.J., and STEWART, J., concur.

DURHAM, Justice (concurring and dissenting):

I concur in the majority opinion except for the portion excluding hypnotically enhanced testimony. I believe that such wholesale exclusion is unnecessary and that a compromise approach has logical and procedural advantages. Furthermore, I think that the majority opinion errs in applying a rule 702 analysis to the problem.

The majority opinion correctly summarizes the current status of the law in other jurisdictions on this subject. In my view, however, it fails to fashion an analytic framework that is consistent with this Court's approach to other similar evidentiary problems. The majority says that "[t]he current skeptical approach to hypnotically enhanced evidence is fully in accord with

---

**19.** In finding section 76-5-202(1)(q) inapplicable to the facts of this case, we do not mean to imply that there is nothing about this murder that makes it somehow worse than other murders. In fact, we recognize that this murder is especially troubling for the same reason that the trial court in *Wood* must have found that murder exceptionally disturbing: both were committed by predatory "good Samaritans" on defenseless motorists with car trouble. That circumstance, however, has nothing whatsoever to do with the infliction of physical abuse before

death, the crux of the *Godfrey–Wood* aggravating circumstance.

**20.** We note that section 76-1-402(5) of the Code provides for the remedy granted in the present case "if such relief is sought by the defendant." Utah Code Ann. § 76-1-402(5) (1978). We find this requirement met by Tuttle's request for a jury instruction on the lesser included offense of second degree murder.

this Court's recognition of the modern reconstructive theory of memory in *State v. Long*." Majority op. at 1210. I agree entirely, but fail to understand why recognition of the theory results in unlimited admissibility for eyewitness testimony and blanket exclusion for hypnotically enhanced testimony. In *Long*, we had the following to say about eyewitness identification testimony:

> [T]he circumstances [in this case] highlight the questionable wisdom of allowing the uncorroborated identification testimony of one eyewitness to serve as the linchpin of the prosecution's case, at least in the absence of an instruction to the jury focusing its attention on the well-documented factors that affect the reliability of eyewitness identifications. The literature is replete with empirical studies *documenting the unreliability of eyewitness identification.* There is no significant division of opinion on the issue. The studies all lead inexorably to the conclusion that human perception is inexact and that human memory is both limited and fallible.

*State v. Long,* 721 P.2d at 488 (Utah 1986) (citations omitted) (emphasis added).

The *Long* opinion goes on to summarize current research and theory on memory process, documenting inherent problems in perception, retention, retrieval, and confidence about accuracy in human recollection. I submit that the case for outright exclusion of eyewitness identification testimony on the grounds of inherent unreliability is as strong as it is for hypnotically enhanced testimony. I further submit that, as we have undertaken ameliorative and protective efforts to limit the impact of the former, we might also logically, and more consistently, do the same with the latter.

The majority adopts a straightforward rule 702 analysis of this problem, describing hypnotically enhanced testimony as "the product of scientific intervention" and therefore equivalent to "expert testimony" within the meaning of the rule. This is an oversimplification which does not adequately account for the purpose and history of rule 702.

Rule 702. Testimony by experts.

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise.

Utah R.Evid. 702.

Scrutiny of the language of the rule demonstrates that it was explicitly designed to address *expert* testimony.

> Whether the situation is a proper one for the use of *expert testimony* is to be determined on the basis of assisting the trier. "There is no more certain test for determining when *experts may be used* than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from *those having a specialized understanding of the subject involved in the dispute.*" Ladd, Expert Testimony, 5 Vand.L.Rev. 414, 418 (1952) (emphasis added).

> The rule is broadly phrased. The fields of knowledge which may be drawn upon are not limited merely to the "scientific" and "technical" but extend to all "specialized" knowledge. Similarly, the expert is viewed, not in a narrow sense, but as a person qualified by "knowledge, skill, experience, training or education." Thus within the scope of the rule are not only experts in the strictest sense of the word, e.g. physicians, physicists, and architects, but also the large group sometimes called "skilled" witnesses, such as bankers or landowners testifying to land values.

Fed.R.Evid. 702 advisory committee's note.

It is obvious that a witness testifying to facts the recall of which has been enhanced by hypnosis is not in any sense "specialized" or "expert" within the meaning of the rule. Consequently, the focus of the rule's concern (i.e., the impact on the trier of fact of "scientific," "specialized," or "expert"

knowledge and opinion) is not relevant at the threshold of determining admissibility. The only relevant inquiry for admissibility purposes should focus on the witness's testimony itself.

Rules 601 and 602 of the Utah Rules of Evidence establish a general rule of competency so long as a witness has "personal knowledge of a matter." Rule 402 provides for the admission of all "relevant evidence," but rule 403 permits exclusion of relevant evidence whose "probative value is substantially outweighed by the danger of unfair prejudice, ... or misleading the jury...." I think the majority opinion, by applying a rule 702 analysis to "personal knowledge" testimony by a lay witness, has distorted the function of that rule and of rules 402, 403, 601, and 602. What should be a prejudice-balancing analysis under rule 403 has been transformed (by treating hypnotically enhanced testimony as "expert" testimony) into a competency evaluation, with a result that is contrary to the language and spirit of rule 601.

If hypnotically enhanced testimony is so inherently unreliable as to permit its outright and wholesale exclusion, then eyewitness identification testimony requires the same treatment.[1] The fact that a witness's recall has been subjected to "scientific intervention" does not change its nature as firsthand testimony about personal recollection. Eyewitness testimony may also have been "tampered with," scientifically or haphazardly, by suggestive investigatory interviewing techniques, improper line-ups, exposure to other witnesses, and so on. There is no more assurance in the case of the nonhypnotized witness that the "memories" testified to are not the product of inaccurate superimpositions or defect-producing phenomena. We do not, however (at least as yet), exclude it entirely; instead, we take all the steps we can to ensure that the fact-finder understands its scientific limitations and inherent problems.

It appears to me, in fact, that the "scientific" nature of hypnosis, despite its prob-

lems, makes it easier for the courts to monitor its effects on eyewitness testimony and to safeguard against its misuse than is true for the more happenstance phenomena which distort nonhypnotically enhanced memory. We can at least control the hypnosis situation by strictly monitoring the qualifications of examiners and the content of the hypnotic intervention as a condition of admissibility. This would be the result of balancing the probative value of the evidence against its potential for prejudice under rule 403.

In conclusion, I acknowledge that the majority opinion's approach reflects a reasonable and probably workable compromise on the admissibility question. However, there are conceptual problems in addressing this issue in a rule 702 framework, and we would be better off to focus on reliability as part of a rule 403 analysis. Rule 403 permits a straightforward, case-specific balancing of probative value and prejudicial potential. That approach is, in my view, more consistent with the language and intent of the Utah Rules of Evidence and does not disrupt the coherence of this Court's approach to the issue of reliability of *expert* scientific evidence under rule 702.

---

**1.** It should be noted that rule 702 would properly be applied to determine the admissibility of expert testimony *about* hypnosis, its reliability, and its general acceptance in the scientific community. Such evidence in connection with eye-

witness identification is not only permissible but has also been judicially acknowledged and incorporated by this Court in cautionary jury instructions. *See State v. Long,* 721 P.2d at 492–95.