42083. WALRAVEN v. THE STATE.
(336 SE2d 798)

SMITH, Justice.

In 1981, a DeKalb County jury convicted the appellant, James Walraven, for the murder of Giselle Clardy. Walraven was sentenced to death. On appeal, this court reversed the appellant's conviction. *Walraven v. State*, 250 Ga. 401 (297 SE2d 278) (1982). The appellant, after a change in venue, was convicted for a second time for Ms. Clardy's murder by a Whitfield County jury. He received a sentence of life imprisonment pursuant to the second conviction. On appeal, he raises four enumerations of error. We affirm.[1]

1. We set out the basic factual framework of this case in *Walraven*, supra. Although not raised upon appeal, we find the evidence sufficient to support the jury verdict under the standard set out in *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

---

[1] The crime was committed on May 28, 1981. The DeKalb County jury returned its verdict of guilty on November 16, 1981. This court reversed on November 23, 1982. A Whitfield County jury returned a second verdict of guilty on September 1, 1983. Notice of appeal was filed on October 3, 1983. The transcript of evidence was filed January 22, 1985. The record was docketed in this Court on March 5, 1985 and argued in this Court on September 9, 1985.

Any substantial, material deletions from or additions to the evidence in the first trial occurring in this case will be noted where appropriate.

2. In his first enumeration of error, the appellant claims that the trial court erred in refusing to grant his motion to change the venue for a second time.[2] "[U]nder the decisions of the Supreme Court of the United States, to find that the petitioner did not receive a fair trial, petitioner must show (1) that the setting of the trial was inherently prejudicial or (2) that the jury selection process showed actual prejudice to a degree that rendered a fair trial impossible." *Street v. State*, 237 Ga. 307, 311 (227 SE2d 750) (1976).

a) The physical distance of the crime in question from Whitfield County,[3] and the lapse of time between the majority of the news reports introduced by the defense pursuant to its motion,[4] and the second trial combine to negate any claim that Whitfield County was an "inherently prejudicial" setting for the appellant's second trial. See *Brooks v. State*, 244 Ga. 574, 578 (261 SE2d 379) (1979).

b) The defense challenged sixteen of the 62 prospective jurors in this case, and the trial court excused five of those challenged based upon their fixed expressions of bias. These ratios fall within the bounds previously set in Georgia as sufficient to show "the absence of prejudicial community bias." *Waters v. State*, 248 Ga. 355, 361 (283 SE2d 238) (1981).

3. In his second enumeration, the appellant claims that the trial court erred in refusing to grant his motion for individual and sequestered voir dire of all prospective jurors.

The trial court adopted a procedure for individual and sequestered voir dire of certain prospective jurors who responded to general questions in a particular manner. The attorneys in the case asked the jurors, in their respective panels, if any of them held opinions as to the case, or if any of them knew of any of the details of the case. Upon a positive response by a juror, that juror would then be subject to individual, sequestered voir dire. In addition, the trial court asked that the jurors only divulge the existence, and not the details, of any opinion or knowledge when questioned in the presence of other jurors.

The appellant cites four comments made by prospective jurors in front of other jurors as evidence of prejudice caused by the trial court's refusal to grant his motion for sequestration of all jurors. He

---

[2] As seen above, on retrial venue was changed from DeKalb County to Whitfield County.

[3] For example, a juror stated during voir dire, "There's so much going on in Atlanta, Georgia, that one more case, weird or otherwise, doesn't bother me — I mean, doesn't get my attention."

[4] Most of the news reports included in the record were published during the first trial or in conjunction with the first appeal. See note 1.

asserts, in turn, that this showing of prejudice supports the finding of an abuse of discretion on the part of the trial court in its refusal to grant the motion. We find no error.

The first three comments cited by the appellant related to the appellant's earlier trial, the death sentence in the first case, or the reversal of the case by this court. While these jurors did violate the trial court's directions as to communicating the existence of the previous trial, the comments, standing alone would not lead to disqualification of any of the jurors. We thus do not find prejudice sufficient to support the finding of an abuse of discretion. *Finney v. State*, 253 Ga. 346, 347 (320 SE2d 147) (1984).

The final comment cited by the appellant divulged the existence of a "statement" made by the appellant to the police. The revelation of the existence of a statement, as opposed to an admission or confession, hardly constitutes prejudice to the appellant absent disclosure of the contents of the statement. We find no error.

4. The appellant asserts that the trial court erred in admitting into evidence a number of crimes independent of the subject murder.

The similarity here between the independent crimes and the subject crime rested upon: a) the sex, race, and appearance of the victims; b) the proximity of the crimes to tennis courts and interstate highways; c) in some instances, eyewitness testimony identifying the appellant near the crime scene, and; d) in some instances a nearly identical modus operandi. The similarity, in all cases here, draws a sufficient thread between the independent crimes and the subject crime, and renders the independent crimes admissible. *Williams v. State*, 251 Ga. 749 (312 SE2d 40) (1983). This court finds no error.

5. The appellant contends that the trial court should have excluded all or part of the testimony of James Buffington.

Buffington worked as an auto mechanic. He spent May 28, 1981, the day of Ms. Clardy's murder, working on a customer's car outside of building U at the Cherry Hill Apartments, Buffington's residence at that time and the site of the Clardy murder. He first discovered that someone had been murdered in the apartments on May 29, the day after the murder, when he saw a large number of policemen and a fire truck in the parking lot outside of building U. He gave his business card to one of the policemen and told the policeman that he had been in the parking lot most of the previous day.

The DeKalb County police interviewed Buffington later that day. He generally described the events that he had observed in the parking lot the previous day. That evening, Buffington went to the police station for further interviews, and to view photographic arrays.

His first signed statement, made at 8:45 p.m. on May 29, contained his description of a number of cars that he had seen in the apartment parking lot on May 28. The last sentence of the statement

reads, "I vaguely remember a car coming, vehicle # 7, about 3:30-4:00 PM but nothing specific."

His second signed statement, delivered shortly after midnight on the morning of May 30, described a meeting around 4:00 or 4:30 on May 28 between a man and a woman in the apartment parking lot. The woman, "a lady dressed as a [neat] business woman," was approached by a white male, about thirty years old, who had arrived at the parking lot in a small white car, "proba[b]ly a convertible," which was driven by another white male of approximately the same age. The man and the woman walked around a corner together. Shortly thereafter, the man trotted back around the corner, jumped in the passenger seat of the car, and was driven away.

After returning to the Cherry Hill Apartments with a police officer during the day on May 30, Buffington again described certain events of the 29th. A police officer made notes of his observations of the conversation with Buffington, but Buffington apparently did not adopt the notes by signature. The first page of the notes, the page that purportedly contained Buffington's detailed description of the man who accosted the woman in the parking lot at the apartment building, was lost at some point prior to the second trial.

The second page of notes describing Buffington's conversation during the day on May 30 contains a description of the clothes worn by the man who accosted the woman. That page also contains a description of the man as, "close to his (Buffington's) height - large wrists - muscled forearms with light colored hair on arms - light hair visible on chest in V-opening of shirt."

Buffington subsequently agreed to undergo hypnosis in an attempt to clear up or draw out certain details lacking from his description of the events that took place in the parking lot on May 28. A DeKalb County investigator testified, at the hearing on the appellant's motion to suppress Buffington's testimony at the second trial, that he had suggested hypnosis to aid Buffington in remembering the license tag number of the car in which the two men arrived. Buffington testified at the same hearing that he may have suggested the hypnosis session in an attempt "to give every bit of information that [he] could possibly recall from what [he] had seen." He also stated that he had "faith" in the hypnosis procedure, and that he felt that he was a suspect in the Clardy murder at the time that he was hypnotized. At the time of the hypnosis session, police apparently had no solid leads in the Clardy murder beyond Buffington's descriptions.

Dr. Rasche, a psychologist in private practice, hypnotized Buffington on June 4, 1981. A police officer was present at the session, but did not participate. Buffington and the police officer claim that no new material evidence, save a very slight amount of added detail involving a car, developed during the session. An audio tape was made

of the session, but it proved inaudible. The only record of the session consists of the police officer's notes made during the session.

Patricia Berry was found strangled, half-naked, and face down in the bathtub of her apartment on June 15, 1981. Johnny Gann provided the Fulton County police a description of a man he saw in the area of Ms. Berry's apartment near the time of her murder. The police developed a composite drawing of the man from the description, and the Atlanta news media published the composite in print and on television.

On March 16, 1981, Connie Harrold was attacked in her home. She also gave the police a description of the man who had attacked her. On July 9, 1981, she picked the appellant out of a photographic array as the man who had attacked her.

On July 14, 1981, Buffington identified the appellant from a photographic array as the man he had seen with Ms. Clardy on the day of her murder. He subsequently picked the appellant out of a lineup. He testified that he had seen the Gann composite, but that he had not found it to be an accurate portrait of the man who had been with Ms. Clardy. At trial, Buffington described the meeting between Ms. Clardy and the man in the parking lot, he described the man, and he identified the appellant as that man.

The appellant asserts that the prosecution's hypnosis of Buffington tainted Buffington's testimony. He contends that the use of hypnosis as a method of producing evidence through heightened recall has not "reached a scientific stage of verifiable certainty," *Harper v. State*, 249 Ga. 519, 525 (292 SE2d 389) (1982), thus, testimony arising from or relating to the hypnosis of a witness should be inadmissible.

The effect of hypnosis on a subject's subsequent testimony, here Buffington's testimony, will be determined by the standard used in determining the validity of scientific principles or techniques set out in *Harper*, supra. As noted in *Harper*, statements made by a subject under hypnosis are not admissible to show the truth of the statement made. *Bobo v. State*, 254 Ga. 146, 148 (327 SE2d 208) (1985); *Emmett v. State*, 232 Ga. 110, 115 (205 SE2d 231) (1974). In *Emmett*, supra at 115, we held that "the reliability of hypnosis has not been established and statements made while the witness was in a trance are inadmissible." By "the reliability of hypnosis," we meant the reliability of the actual testimonial product of the hypnosis session. We did not delve into the effect of hypnosis on testimony subsequent to the hypnosis session that was not substantially consistent with recorded, pre-hypnotic statements.[5]

---

[5] There, this court allowed the previously hypnotized witness to testify because "it is clear . . . that she related . . . the principal facts and details of the crime before her hypnotic session." Id.

In *Harper*, we held that courts in Georgia should not "count heads" in the scientific community to determine the validity of scientific processes or techniques. We established, instead, the rule that the court reviewing the procedure or technique could consult evidence presented at trial, including expert testimony, or "exhibits, treatises, or the rationale of cases in other jurisdictions." *Harper*, supra at 525. In the case of hypnosis, the scientific community has documented, and the courts in various states have noted, the dangers inherent in the use of hypnosis to refresh or uncover a witness' memories. See, e.g., Diamond, *Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness*, 68 Cal.L.Rev. 313 (1980); Orne, *The Use and Misuse of Hypnosis in Court*, 27 Int. J. of Clinical and Experimental Hypnosis 311 (1979); *People v. Shirley*, 31 Cal.3d 18 (181 Cal.Rptr. 243, 641 P2d 775) (1982); *State v. Hurd*, 86 N.J. 525 (432 A2d 86) (1981).

The two primary dangers inherent in the hypnosis of a potential witness, recognized almost universally, are known as "cementing" and "confabulation." See *Hurd*, supra at 537-542 and cites therein. Cementing occurs when the subject of hypnosis recounts a version of a certain memory accompanied by the suspension of critical judgment inevitably caused by hypnosis. The events as recalled under hypnosis "set up" in the witness' mind due to the suspension of critical judgment and the witness' belief that the hypnosis will produce the "correct" memory. Cementing creates a confident witness and renders cross-examination difficult at best. Id. at 540.

Confabulation occurs when the subject of the hypnosis responds to suggestion or expectation to fill in gaps in his memory with fantasy, exaggeration, or memories of other events transferred to compensate for the lack of actual memory. *Hurd*, supra at 539 and cites. The pressure to fill in the gaps may come from within the witness himself through the desire to be involved in a case or the desire to be a good witness. It may come from the hypnotist through leading questions, repeated questions as to detail, or even body language. The possibility of inaccurate testimony created by confabulation presents perhaps the greatest danger caused by hypnosis of a potential witness. Orne, supra at 311.

Courts in the various states have responded to these dangers in a variety of ways. *Hurd*, supra, represents one state's attempt to deal with the problems caused by hypnosis of potential witnesses by establishing certain guidelines for a party to follow in hypnotizing a potential witness. These guidelines, which generally follow those suggested in Orne, supra, at 335-336, require that the hypnosis be performed by an expert who is independent of the prosecution and the defense. All information given to the expert regarding the case must be recorded. The hypnotist must be alone with the subject during the session. At

the beginning of the session, before the actual hypnosis, the hypnotist should ask the subject to describe the relevant facts. Finally, all contact between the hypnotist and the subject should be recorded.

The Supreme Court of California, in *Shirley*, supra, considered, then rejected the guidelines set out in *Hurd*. Stating that the *Hurd* guidelines did not adequately safeguard against all dangers of hypnosis, and that such safeguards would inject confusion and added delay into a trial, the *Shirley* court ruled inadmissible all testimony by any potential witness who had been hypnotized.[6] Under this rule any person who has been hypnotized is considered irreparably tainted.

While we agree with the California Supreme Court that the *Hurd* guidelines may prove excessively confusing and unwieldy, *Shirley*, supra at 39-40, we agree with the New Jersey court's determination that hypnosis does not inevitably corrupt the memory of every potential witness who undergoes the process. *Hurd*, supra at 541-543. Henceforth, in Georgia, the testimony of a previously hypnotized witness will not be considered corrupt and inadmissible, as it is in California. That testimony will simply be considered frozen, for the purposes of the party subjecting the witness to hypnosis, as of the date of the hypnosis. That witness subsequently, may only testify, for the party subjecting the witness to hypnosis, as to the specific content of recorded statements that he has made prior to hypnosis,[7] or as to events occurring after the hypnosis session. Such a rule will put teeth in the *Emmett* holding.

Here, the trial court should have limited Buffington's testimony as to the events that took place in the parking lot to the substance of his pre-hypnotic statement. Excepting Buffington's identification of the appellant, which we address below, his testimony as to matters outside of the scope of his pre-hypnotic statements did not prejudice the appellant sufficiently to render the trial court's admission of that testimony harmful error.

As the court in *Hurd* recognized, a review of a post-hypnotic identification presents a different situation from a review of post-hypnotic testimony. We adopt the New Jersey court's requirement that the party wishing to introduce the identification show, by clear and convincing evidence, that the identification did not arise from and was not cemented during the hypnosis session, in addition to the standard requirements of reliability. *Hurd*, supra at 548; see also *Neil v. Biggers*, 409 U. S. 188 (93 SC 375, 34 LE2d 401) (1972).

Here, the state has shown that neither the investigating officers

---

[6] The *Shirley* court carved out certain exceptions to the rule. 31 Cal.3d at 67.

[7] Due to the facts of *this* case, we do not here deal with the situation, found in *Shirley*, where a witness who has given inconsistent testimony as to an event chooses a version of that event during or after hypnosis session.

nor Buffington were aware of the appellant's identification. No description of the appellant, independent of Buffington's, existed at the time of the hypnosis session. The session could not have caused Buffington to confabulate the identification of the appellant.[8] The initial identification took place well after the hypnosis session. We find no impermissible suggestion.

*Judgment affirmed. All the Justices concur, except Marshall, P. J., Gregory and Weltner, JJ., who concur specially.*

GREGORY, Justice, concurring specially.

I concur in the judgment of the court and write separately with reference to Division 5 of the majority opinion. In my view, the majority opinion adopts a rule of per se inadmissibility of post-hypnotic testimony of a witness who has undergone hypnosis. I would not go so far. Under our rule in *Harper v. State*, 249 Ga. 519 (292 SE2d 389) (1982), post-hypnotic testimony should be admitted, providing the trial court determines that under the procedures followed in a specific case the use of hypnosis to refresh memory is comparable in reliability to ordinary recall.

I believe guidelines to determine reliability should be developed on a case by case basis. However, the suggestions of the Supreme Court of New Jersey in *State v. Hurd*, 86 N.J. 525 (432 A2d 86) (1981), derived from findings of Martin T. Orne, see 27 Int. J. of Clinical and Experimental Hypnosis 311 (1979), constitute one approach for those using hypnosis to follow and later to be evaluated by the trial court. Ultimately the decision is one for the discretion of the trial judge.

I am authorized to state that Presiding Justice Marshall and Justice Weltner join in this special concurrence.

DECIDED DECEMBER 3, 1985 —
RECONSIDERATION DENIED DECEMBER 19, 1985.

*Keenan & Associates, Don C. Keenan, Thomas M. West,* for appellant.

*Robert E. Wilson, District Attorney, Susan Brooks, Assistant District Attorney, Michael J. Bowers, Attorney General, Eddie Snelling, Jr., Staff Assistant Attorney General,* for appellee.

---

[8] Buffington had apparently not seen any pictures of Walraven prior to hypnosis.