S04A1098. WATSON v. THE STATE.

(604 SE2d 804)

THOMPSON, Justice.

Defendant James Lamar Watson, Jr. was convicted of malice murder in connection with the death of his wife, Beverley Watson.[1] He appeals, asserting, inter alia, the trial court erred in admitting, under the necessity exception to the hearsay rule, statements which Beverley made before her death to several friends and a police officer. We find no error and affirm.

Viewing the evidence in a light favorable to the verdict, we find the following: Defendant and Beverley were married in 1983. They lived in Fayette County with two children, Ashley and Todd, who were born in 1984 and 1990, respectively. The Watsons had a stormy, often violent relationship. Defendant was known to stalk Beverley. He telephoned her constantly, and often visited her at work unannounced. On at least one occasion, he threatened her with a shotgun; on another, when Beverley came home with a friend, he threw her against a wall. In 1994 the parties separated and defendant was placed under a restraining order pursuant to divorce proceedings initiated by Beverley. He violated the order by entering Beverley's home, refusing to leave, and physically abusing Beverley. Nevertheless, the Watsons reconciled.

Defendant, who had nine years of law enforcement experience and police academy training, continued to abuse Beverley even after they reconciled. In 1996 defendant and Beverley again discussed a separation. By early January 1997, Beverley decided to move out of

---

[1] Beverley disappeared on January 18, 1997. Defendant was indicted on January 15, 2002, and charged with murdering Beverley in an undetermined manner. Trial commenced on June 3, 2002; the jury returned its verdict on June 18. Defendant's timely filed motion for a new trial was denied on January 13, 2004, and defendant filed a notice of appeal on January 15, 2004. The case was docketed in this Court on March 10, 2004, and orally argued on June 15, 2004.

the house and leave defendant. She brought boxes home to prepare for the move. Defendant was aware of Beverley's plan.

On Friday night, January 17, 1997, Beverley came home to take Todd to the movies. (Ashley was spending the night out.) When she arrived home, she discovered that defendant sent Todd out to stay with Kathy Ragsdale, defendant's sister. Beverley and defendant fought. According to defendant, Beverley threw her car keys at him and scratched his nose; he went into the garage to play with his dogs; Beverley walked out the front door of the house. The night was bitterly cold (10 or 11 degrees Fahrenheit). Nevertheless, Beverley did not take her coat; she did not take her purse or jewelry, either.

The next Monday, defendant covered the scratches on his nose with makeup. Then he went to the sheriff's office to report Beverley missing. He did not seem overly concerned or worried. He explained that Beverley often took off for a while after a marital spat. He added that, on the night in question, he went to sleep between 2:00 and 3:00 a.m. However, at 3:30 a.m. a neighbor saw defendant in his yard; he was carrying a black bag.

Two years later, a surveyor found the partial skeletal remains of a woman in a wooded area in Fulton County. Dental records confirmed that the remains were those of Beverley.

1. The evidence, although primarily circumstantial, was sufficient to enable any rational trier of fact to find defendant guilty beyond a reasonable doubt of malice murder. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). See also *Atkins v. State*, 274 Ga. 103, 104 (1) (549 SE2d 356) (2001). Viewing the evidence in a light most favorable to the verdict, the jury could have found that every reasonable hypothesis except Watson's guilt was excluded. *Rushing v. State*, 271 Ga. 102, 105 (3) (515 SE2d 607) (1999).

2. Watson's first enumeration of error concerns the trial court's admission of hearsay testimony under the necessity exception, OCGA § 24-3-1 (b). At trial, the State was allowed to present the hearsay testimony of three of Beverley's friends, as well as that of Deputy Steve Borders, as to statements made by Beverley over the course of approximately ten years. By this Court's count, approximately 30 hearsay statements were allowed during the testimony of the three friends and the deputy. The substance of the hearsay statements concerned threats made by Watson, episodes of physical and mental abuse, and other instances of prior difficulties between Watson and Beverley.

(a) *Beverley's statements to Debbie White, Krista Hinkle, and Ellen Lord.* The trial court conducted a two-day pretrial hearing which focused primarily on the admission of hearsay evidence. During this hearing, Debbie White, Krista Hinkle, and Ellen Lord testified as to statements that Beverley made to them. The trial court

was able to fully evaluate the credibility of these witnesses prior to trial. This Court concludes, based on the totality of the circumstances, that the admission of the hearsay testimony was proper.[2]

In order for hearsay to be admitted under the necessity exception, two requirements must be satisfied: "necessity" and "particularized guarantees of trustworthiness." *Azizi v. State*, 270 Ga. 709, 711 (512 SE2d 622) (1999); *McKissick v. State*, 263 Ga. 188 (429 SE2d 655) (1993). "Necessity" is demonstrated when the declarant is deceased, when the statement is shown to be relevant to a material fact, and when the statement is more probative of the material fact than other evidence that may be produced and offered. *Chapel v. State*, 270 Ga. 151, 155 (510 SE2d 802) (1998). The requirement of "particularized guarantees of trustworthiness" is satisfied when the declaration is coupled with "circumstances which attribute verity to [the declaration]." *Roper v. State*, 263 Ga. 201, 202 (429 SE2d 668) (1993). The determination of trustworthiness is "inescapably subjective" and the trial court's determination of the issue will not be disturbed absent an abuse of discretion. *Gissendaner v. State*, 272 Ga. 704, 710-711 (532 SE2d 677) (2000).

We have no hesitation in concluding that the "necessity" requirement is satisfied in this case. The declarant is deceased and thus, unavailable to testify. The statements are relevant to a material fact, namely to show Watson's intent, motive, and bent of mind. *Simmons v. State*, 266 Ga. 223, 224 (466 SE2d 205) (1996). The statements admitted were more probative of these facts than evidence that could otherwise be produced and offered. *Azizi*, supra.

Turning to the "particularized guarantees of trustworthiness" prong, this Court has consistently held that hearsay testimony by close, personal friends of the unavailable declarant is admissible under the necessity exception. See, e.g., *Bell v. State*, supra; *Demons v. State*, 277 Ga. 724 (595 SE2d 76) (2004); *McPherson v. State*, 274 Ga. 444 (553 SE2d 569) (2001); *Morrow v. State*, 272 Ga. 691 (532 SE2d 78) (2000); *Ward v. State*, 271 Ga. 648 (520 SE2d 205) (1999); *Chapel v. State*, supra. We are mindful that, in specific instances, cases involving statements made to friends may not contain sufficient indicia of reliability. In *Slakman v. State*, 272 Ga. 662, 668 (533 SE2d 383) (2000), for example, this Court held that, under the circumstances of that case, hearsay statements made to friends known by the victim for only a few weeks were inadmissible. However, in this case, the three witnesses adequately demonstrated that they were

---

[2] Because these statements were not testimonial in nature, they are not subject to a *Crawford* analysis. *Crawford v. Washington*, 541 U. S. 36 (124 SC 1354, 158 LE2d 177) (2004); *Bell v. State*, 278 Ga. 69, 72 (597 SE2d 350) (2004).

longtime, close friends of the victim. Beverley knew both Debbie White and Krista Hinkle since childhood; she knew and worked with Ellen Lord for more than a year and they regularly confided in each other about personal matters. Based upon the authorities cited above, the trial court was authorized to find that the statements Beverley made to these witnesses contained particularized guarantees of trustworthiness.

Watson argues that Beverley's statements to her three friends were inconsistent. Of course, inconsistencies and the recanting of statements can undermine the indicia of reliability of the statements and render them inadmissible. See, e.g., *Mallory v. State*, 261 Ga. 625 (409 SE2d 839) (1991) (inconsistent statements not "sufficiently trustworthy"); *Higgs v. State*, 256 Ga. 606 (351 SE2d 448) (1987) (failure to recant statement is factor favoring guarantee of trustworthiness). However, a mere inconsistency does not necessarily render a statement unworthy of belief. The test is whether the totality of the circumstances are such that verity can be attributed to the statement. *White v. White*, 262 Ga. 168 (415 SE2d 467) (1992).

Of the numerous hearsay statements admitted into evidence, the inconsistent statements concerned Beverley's broken arm. With Watson present, Beverley told her friends that she tripped over a pillow; when Watson was away, she told them he pushed her down the stairs. However, these inconsistent statements have a logical consistency of their own. Compare *Boehm v. Abi-Sarkis*, 211 Ga. App. 181, 183 (438 SE2d 410) (1993) (no apparent reason why deceased declarant would make inconsistent statements to sister and friend). The statements were consistent in that Beverley never recanted her reports of abuse. The only inconsistency arose, understandably and quite naturally, when Watson was present. Given the totality of the circumstances under which these statements were made, it cannot be said that the trial court abused its discretion in finding the statements trustworthy and admissible.

Watson also argues that most of the hearsay statements were made while Beverley was seeking a divorce or was in contemplation of divorce and that, therefore, the statements are unreliable and self-serving. However, this Court has determined that declarations "by one who is a party to a divorce action, with the anticipation that the declarations may prove useful" are not subject to a bright-line rule barring their admission under the necessity exception. *Wright v. State*, 276 Ga. 454, 459 (579 SE2d 214) (2003). In the instant case, moreover, many of the statements were not made during the pendency of the 1994 divorce action. See *Azizi v. State*, supra at 712 (statements made to confidant before deceased declarant began affair are not subject to doubt). Given that the statements at issue were made over a ten-year period, only some of which included a period of

separation and divorce proceedings, this Court cannot conclude that the trial court abused its discretion in admitting the statements on this basis.

Watson further argues that the hearsay statements were not corroborated by other admissible evidence, and thus, should have been excluded. However, "[c]orroboration is not a required indicia of reliability, and is not even necessarily an appropriate consideration in applying the necessity exception." *Demons v. State*, 277 Ga. 724, 727, supra; *Yancey v. State*, 275 Ga. 550, 555 (570 SE2d 269) (2002).

Additionally, Watson argues that the hearsay statements were unworthy of trust because of the amount of time that passed between the statements and the incidents which they described. While the passage of time is a factor in determining admissibility, if the trial court is convinced that the statement contains sufficient indicia of reliability the statement is admissible. In this case, some of Beverley's statements to her friends occurred within minutes or hours of events they described; others described events which took place long before. Nevertheless, the statements bore sufficient indicia of reliability and they were properly admitted. See *White v. State*, 268 Ga. 28, 30-31 (486 SE2d 338) (1997) (decedent's statements made four and eight months following the events to which they relate were admissible).

(b) *Beverley's statements to Deputy Borders.* Deputy Borders testified that he responded to a "911" call at Watson's house on August 3, 1994; and that Beverley told him she was afraid of Watson and that he could become violent very easily. Although the trial court conducted a pretrial hearing on a motion in limine challenging the admissibility of this statement, it did not make a ruling on the record regarding its admissibility. Normally, when a defendant moves in limine for the exclusion of evidence and the trial court, on the record, rules the evidence admissible, the record is preserved and the defendant is not required to object to the evidence during trial. *Simpson v. State*, 277 Ga. 356, 357 (589 SE2d 90) (2003); *Harley-Davidson Motor Co. v. Daniel*, 244 Ga. 284, 285-286 (260 SE2d 20) (1979). In this case, the trial court did not rule on the admissibility of Borders' testimony at the pretrial hearing. On direct examination, the deputy testified about Beverley's statement to him without objection. It was not until after the direct examination had been completed that defense counsel interposed a hearsay objection. Thus, any complaint concerning Deputy Borders' hearsay testimony was not preserved for review. *Pendergrass v. State*, 275 Ga. 264 (3) (564 SE2d 443) (2002).

Even if this issue had been preserved, we would find no reversible error. The trial court admitted Borders' hearsay testimony under the necessity exception, indicating that the testimony had the requisite indicia of reliability as it was a statement made to a law

enforcement officer during an investigation. The United States Supreme Court, in *Crawford v. Washington*, supra, held that where "testimonial" hearsay evidence is sought to be introduced, the Sixth Amendment to the United States Constitution requires that there be an opportunity for cross-examination. The Court refused to define "testimonial," but expressly stated that the term did apply, inter alia, to "police interrogations." Id. at 1374. In interpreting *Crawford*, this Court has said that statements made to police officers during an investigation qualify as testimonial. *Bell v. State*, supra at 72; *Moody v. State*, 277 Ga. 676, 679-680 (594 SE2d 350) (2004). In both *Bell* and *Moody*, we found that the trial court erred in admitting these statements under the necessity exception to the hearsay rule; however, in each case, the error was harmless as the erroneously admitted testimony was cumulative of other evidence.

As in *Bell* and *Moody*, the hearsay portion of Deputy Borders' testimony, which consisted of no more than two sentences, was cumulative of other, properly admitted evidence. Moreover, the deputy's testimony did not go to the core issue of the case — Watson's guilt or innocence of the crime for which he was convicted. Compare *Brawner v. State*, 278 Ga. 316 (602 SE2d 612) (2004). Thus, even if erroneous, the admission into evidence of Deputy Borders' hearsay testimony was harmless.

3. The trial court did not err in refusing to permit Watson's sister, Sandy Wells, to testify about conversations she had with Beverley. Beverley was not a close personal friend of Wells, and she only confided in Wells on "some occasions." Moreover, Wells said she was "not around" Beverley and Watson "much." Thus, it is apparent that Beverley did not have the same relationship with Wells that she had with White, Hinkle and Lord; and it cannot be said that the nature of Beverley's relationship with Wells gave rise to any particular indicia of reliability. See *Slakman v. State*, supra at 667 (3).

Responding to Watson's request to explain why it excluded Wells' hearsay testimony, the trial court said: "I don't find this witness to be trustworthy nor reliable with respect to this particular type of testimony, and that is hearsay declaration." Although the trial court's statement was somewhat imprecise, it is clear in context that it was not directed at Wells' credibility in general, but rather, the issue of the trustworthiness of the statements Wells was relating. Nevertheless, at defense counsel's urging, the trial court gave a curative instruction which, in the absence of the prompt renewal of a motion for mistrial,[3]

---

[3] The curative instruction appears on page 3,106 of the transcript; the renewed motion for a mistrial appears later, on page 3,131.

put an end to the matter. *Pritchard v. State*, 225 Ga. 690, 691 (1) (171 SE2d 130) (1969).

4. After Sandy Wells testified, the trial court charged the jury as follows:

> The rule of sequestration states in pertinent part that each party has the right to have witnesses examined out of the hearing of each other. When a witness hears or learns of the testimony of other witnesses, you may consider this in determining the weight and credit to be given to the testimony of the witness on the issue discussed.

The charge was not a comment on the credibility of Wells; nor did it suggest that Wells violated the rule of sequestration. " 'While a court may not express an opinion as to what has or has not been proven, OCGA § 17-8-57, remarks made by the court regarding the admissibility of evidence or explaining the court's rulings are not such a comment or opinion. (Cits.)' *Russell v. State*, 184 Ga. App. 657 (2) (362 SE2d 392) (1987)." *Mitchell v. State*, 275 Ga. 42, 44 (4) (561 SE2d 803) (2002).

5. Because Watson had said that he had been scratched on the thigh by a cat at or near the time of the murder, the State introduced the expert testimony of Dr. Peter Borchelt, an animal behaviorist. Dr. Borchelt examined photographs of the scratches and opined that they were inconsistent with the scratches of a cat. Following the cross-examination of Dr. Borchelt, the trial court quipped: "Most educational. Thank you very much, sir. You may be excused. Ladies and gentlemen, there's an adage that we have in the legal profession about asking questions on cross-examination. If you don't know the answer, don't ask the question. So all we want to know about cat scratches." Thereupon, Watson moved for a mistrial on the ground that the trial court improperly commented on the evidence. In denying the motion, the trial court observed: "[D]uring that entire course of cross-examination, the jury . . . found a great deal of humor in the questions that were being asked . . . and the court's comment was just simply to follow up on that and was an attempt not to point to anything defective about your cross-examination or to comment on the evidence, but to follow up on the humor that the entire courtroom felt at the time." Nevertheless, the trial court admonished the jury: "Ladies and gentlemen, the court by its last comment meant no disrespect to [defense counsel] nor should it be taken as any kind of comment on the evidence. I was simply following up on what was the general mood in the courtroom."

Our review of the examination and cross-examination of Dr. Borchelt reflects that the trial court's observation was accurate. Dr.

Borchelt's testimony was at times humorous and, under the circumstances, the jury would not have interpreted the trial court's remarks as a comment on the credibility of Dr. Borchelt or the efficacy of defense counsel's cross-examination. Compare *Jordan v. State*, 259 Ga. App. 551 (578 SE2d 217) (2003) with *Jones v. State*, 189 Ga. App. 232 (1) (375 SE2d 648) (1988).

6. Watson asserts he was denied a fair trial in view of the sum total of the trial court's comments on the evidence. This assertion is without merit. Georgia does not recognize the cumulative error rule. *Bridges v. State*, 268 Ga. 700, 708 (9) (492 SE2d 877) (1997).

7. OCGA § 17-2-2 (c) provides, in part:

> If a dead body is discovered in this state and it cannot be readily determined in what county the cause of death was inflicted, it shall be considered that the cause of death was inflicted in the county in which the dead body was discovered.

Inasmuch as Beverley's body was discovered in Fulton County and the county in which the cause of death was inflicted could not be readily determined, it was proper to allege, and for the jury to find, that venue was appropriate in Fulton County. *Cook v. State*, 273 Ga. 828, 829 (2) (546 SE2d 487) (2001); OCGA § 17-2-2 (c). The mere fact that some circumstances pointed to Fayette County as the place of death did not demonstrate that there was a fatal variance between the allegata and probata. Since there was no *actual evidence* of the place of the murder, the county in which the cause of death was inflicted could not be "readily determined." See *Kidwell v. State*, 264 Ga. 427, 431 (8) (444 SE2d 789) (1994).

8. The trial court did not err in permitting the medical examiner to testify that, inasmuch as Beverley's body was discovered in a wooded area approximately 20 miles from her house, Beverley's death was "most likely" a homicide. Defendant did not object to this testimony; thus, he waived this issue on appeal. See *Stephens v. State*, 259 Ga. 820 (2) (388 SE2d 519) (1990). Besides, the testimony was not improper under the circumstances of this case. See generally *Medlock v. State*, 263 Ga. 246, 248 (3) (430 SE2d 754) (1993).

9. The State's cross-examination of defendant's character witness, Larry Elzey, was not improper. The State's questions about specific incidents were asked in good faith and based upon reliable information and admissible evidence. *Medlock v. State*, supra at 247; *State v. Clark*, 258 Ga. 464 (369 SE2d 900) (1988).

10. In an attempt to show that a third person murdered Beverley, Watson proffered the testimony of James Odom. Odom averred that, on November 10, 2001, he fled the scene of a Clayton County murder with Bobby Gray; that he was scared and confused and that Gray

"was saying all kinds of things . . . trying to tell me to calm down"; that Gray said that "he had killed people before and buried them in the woods"; that Gray asked him if he "remembered a Riverdale policeman and his wife"; and that Gray added "he [the policeman] did not work for Riverdale anymore." Gray was called to the stand and denied that he ever made any such statements; he asserted his right against self-incrimination when he was asked questions about the unrelated murder. The trial court refused to permit Odom to testify and Watson enumerates error upon that ruling.

The trial court did not abuse its discretion in refusing to admit the proffered evidence. See *Alexander v. State*, 239 Ga. 108, 110 (236 SE2d 83) (1977) (admission of relevant evidence rests within sound discretion of trial court).

> "Certainly a defendant is entitled to introduce relevant and admissible testimony tending to show that another person committed the crime for which the defendant is tried. [Cit.] However, the proffered evidence must raise a reasonable inference of the defendant's innocence, and must directly connect the other person with the corpus delicti, or show that the other person has recently committed a crime of the same or similar nature. [Cits.]" *Klinect v. State*, 269 Ga. 570, 573 (501 SE2d 810) (1998). Evidence that merely casts a bare suspicion on another or raises a conjectural inference as to the commission of the crime by another is not admissible. *Azizi v. State*, 270 Ga. 709, 714 (6)[, supra].

*Livingston v. State*, 271 Ga. 714, 721 (524 SE2d 222) (1999). The proffered evidence in this case was too threadbare to be admissible. At best, the evidence did nothing more than toss a bare suspicion in the direction of Gray.

11. The trial court did not err in permitting Lenore Walker, an expert on the battered women's syndrome, to explain why Beverley would not have reported instances of abuse and why she dismissed her petition for divorce and reconciled with Watson.

> The battered person syndrome is a "complex area of human response and behavior." *Johnson v. State*, 266 Ga. 624, 627 (2) (469 SE2d 152) (1996). Therefore, expert testimony must be admitted because it supplies an interpretation of the facts which differs from the ordinary lay perception. *Johnson v. State*, supra at 626 (2). An opinion regarding the battered person syndrome, like the child sexual abuse accommodation syndrome, can "only be based on something more than

mere observation." *Carr v. State*, 267 Ga. 701, 703 (1) (482 SE2d 314) (1997).

*Bishop v. State*, 271 Ga. 291, 292 (3) (519 SE2d 206) (1999).

12. Watson asserts that the State impermissibly bolstered Walker's credibility when it asked about her qualifications in the presence of the jury after she had been qualified already as an expert in the jury's absence. This is a matter best left to the discretion of the trial judge. See Rumsey, Agnor's Ga. Evidence (3rd ed.), § 9-5, p. 212. Ordinarily "the jury should be entitled to know all about the qualifications of the witness in order to properly evaluate his testimony." Id. We find no abuse of discretion in this case.

13. Watson claims the trial court erred in permitting Ellen Lord to testify because her recollection of events was tainted following a hypnotic session. We disagree.

> [S]tatements made by a subject under hypnosis are not admissible to show the truth of the statement made. *Bobo v. State*, 254 Ga. 146, 148 (327 SE2d 208) (1985); *Emmett v. State*, 232 Ga. 110, 115 (205 SE2d 231) (1974). In *Emmett*, supra at 115, we held that "the reliability of hypnosis has not been established and statements made while the witness was in a trance are inadmissible." By "the reliability of hypnosis," we meant the reliability of the actual testimonial product of the hypnosis session. We did not delve into the effect of hypnosis on testimony subsequent to the hypnosis session that was not substantially consistent with recorded, pre-hypnotic statements. . . .
>
> The two primary dangers inherent in the hypnosis of a potential witness, recognized almost universally, are known as "cementing" and "confabulation." [Cit.] Cementing occurs when the subject of hypnosis recounts a version of a certain memory accompanied by the suspension of critical judgment inevitably caused by hypnosis. The events as recalled under hypnosis "set up" in the witness' mind due to the suspension of critical judgment and the witness' belief that the hypnosis will produce the "correct" memory. Cementing creates a confident witness and renders cross-examination difficult at best. [Cit.]
>
> Confabulation occurs when the subject of the hypnosis responds to suggestion or expectation to fill in gaps in his memory with fantasy, exaggeration, or memories of other events transferred to compensate for the lack of actual memory. [Cit.] The pressure to fill in the gaps may come from within the witness himself through the desire to be involved in a case or the desire to be a good witness. It may come from

the hypnotist through leading questions, repeated questions as to detail, or even body language. The possibility of inaccurate testimony created by confabulation presents perhaps the greatest danger caused by hypnosis of a potential witness. [Cit.]

Courts in the various states have responded to these dangers in a variety of ways. . . .

[W]e agree with the New Jersey court's determination that hypnosis does not inevitably corrupt the memory of every potential witness who undergoes the process. [Cit.] Henceforth, in Georgia, the testimony of a previously hypnotized witness will not be considered corrupt and inadmissible, as it is in California. That testimony will simply be considered frozen, for the purposes of the party subjecting the witness to hypnosis, as of the date of the hypnosis. That witness subsequently, may only testify, for the party subjecting the witness to hypnosis, as to the specific content of recorded statements that he has made prior to hypnosis, or as to events occurring after the hypnosis session.

*Walraven v. State*, 255 Ga. 276, 280-282 (336 SE2d 798) (1985).

The trial court conducted a pretrial hearing to determine the extent to which Lord's testimony may have been influenced by hypnosis. It was determined that Lord gave an oral and written statement to the police in January 1997;[4] that she was not hypnotized until mid-1997; and that she gave another written statement to the police in 1999. The recording of Lord's hypnotic session was lost, but witnesses who attended the session testified that Lord provided no new details at that time.

Lord's previous and post-hypnotic statements were not in conflict. However, they did differ in that in her 1999 statement Lord supplied some additional information which she had not disclosed previously. To the extent that the statements differed, the trial court limited Lord's testimony to her pre-hypnotic statements.

We find no error. Lord's testimony was not rendered inadmissible simply because the recording of the hypnotic session was unavailable or because her pre-hypnotic oral statement was not reduced contemporaneously to a writing. The trial court went to great lengths to comply with the spirit and goals of *Walraven* and to ensure that Lord's testimony was not tainted or corrupted by hypnotic suggestion.

---

[4] Lord gave an oral statement to Agent Sam White on January 20, 1997. She made a written statement which the police received on January 23. White subsequently reduced Lord's oral statement to written form.

Besides, nearly all of Lord's testimony was cumulative of other evidence admitted at trial.

14. Given the trial court's finding that Watson acted in bad faith in failing to provide discovery and that a continuance would unfairly burden the court and the State, it cannot be said the trial court abused its discretion in excluding a telephone log and credit card receipt which Watson first tendered two weeks after the start of trial.[5] OCGA § 17-16-6; see *Ehle v. State*, 275 Ga. 560, 564 (570 SE2d 284) (2002) (abuse of discretion standard). See also *Sullivan v. State*, 242 Ga. App. 839 (4) (531 SE2d 367) (2000) (finding of prejudice and bad faith implicit in trial court's decision to exclude evidence for failure to provide discovery). Nor can it be said the trial court erred in excluding photographs of an automobile which were taken by Watson's investigator. Watson tendered the photographs to show the amount of dust on the car before and after it was driven from Watson's house to the site where Beverley's body was found. Watson wanted to introduce this evidence to counter evidence suggesting that at the time of the murder Watson's wife's vehicle gathered dust which was not inconsistent with dust at that site. However, this evidence was also tendered belatedly in violation of Watson's reciprocal discovery obligations. *Sullivan v. State*, supra. Moreover, Watson did not demonstrate that his investigator's "experiment" reflected the same conditions as at the time of the murder. See *Hicks v. State*, 146 Ga. 221 (91 SE 57) (1916).

15. The trial court did not err in refusing to permit Watson to introduce a videotape of a statement he gave to Detective Frank Martin at the time of his arrest.[6] The statement was not offered to rebut a charge of recent fabrication, improper influence or improper motive. See *Woodard v. State*, 269 Ga. 317, 320 (496 SE2d 896) (1998). Thus, the statement was properly ruled inadmissible as pure hearsay. Id. Contrary to Watson's assertion, *Parker v. State*, 276 Ga. 598 (2) (581 SE2d 7) (2003) does not hold that a self-serving declaration is admissible whenever a declarant testifies and is subject to cross-examination.

Nor did the court err in preventing Watson from questioning the detective about the existence of the videotape. That Watson cooperated with the detective was irrelevant and, in any event, cumulative of other evidence showing Watson cooperated with the police.[7]

---

[5] Watson sought to have this evidence admitted to rebut the State's contention that he had once driven to Daytona Beach, Florida, to fetch Beverley while she was vacationing with friends.

[6] The State did not introduce the videotape into evidence.

[7] It was shown, for example, that Watson readily gave investigators his keys to enable them to search his house.

16. The State played a portion of a videotape of a television news interview with Watson which was made shortly after Beverley disappeared. Watson wanted to introduce another portion of the videotape depicting another interview with Watson which occurred three days later. In this regard, Watson argued that the subsequent interview was relevant to counter the State's contention that Watson's demeanor was calm and unemotional. The trial court ruled that it would permit Watson to play the tape without sound. This ruling was designed to keep the jury from hearing Watson's self-serving statements while enabling it to see Watson cry and observe his facial expressions. Watson asserts the trial court erred in preventing the jury from observing his demeanor fully, i.e., with its ears as well as its eyes. We disagree. It would appear that after much colloquy Watson acquiesced in the trial court's ruling. Moreover, error, if any, was harmless.

17. Watson argues that the State engaged in prosecutorial misconduct when it commented on his lack of remorse and made an improper golden rule argument in its closing remarks. However, Watson failed to interpose a contemporaneous objection to the State's comments and the "contemporaneous objection rule cannot be avoided by characterizing trial occurrences as examples of prosecutorial misconduct." *Spencer v. State*, 260 Ga. 640 (9) (398 SE2d 179) (1990). See also *Ledford v. State*, 264 Ga. 60, 67 (439 SE2d 917) (1994). Moreover, in context, the State's "lack of remorse" comments were aimed at Watson's lack of emotion;[8] they did not raise the issue of Watson's right to remain silent. See *Hammond v. State*, 264 Ga. 879 (8) (b) (452 SE2d 745) (1995). Finally, the State did not violate the golden rule; it merely invited the jurors to "speak for Beverley by letting her killer know that you're not going to let him get away with it." It did not ask the jurors to put themselves in the victim's place at the time the crime was committed. See *Braithwaite v. State*, 275 Ga. 884 (2) (572 SE2d 612) (2002); *Horne v. State*, 192 Ga. App. 528, 529 (385 SE2d 704) (1989).

*Judgment affirmed. All the Justices concur.*

DECIDED NOVEMBER 8, 2004 —
RECONSIDERATION DENIED DECEMBER 9, 2004.

*Sexton & Morris, Lee Sexton, Joseph S. Key*, for appellant.
*Paul L. Howard, Jr., District Attorney, Bettieanne C. Hart, Christopher M. Quinn, Assistant District Attorneys, Thurbert E. Baker,*

---

[8] The State pointed out, for example, that Watson was calm when he reported Beverley missing; and that he did not emote when he was told that her body had been discovered. See Division 16.

*Attorney General, Jason C. Fisher, Assistant Attorney General,* for appellee.